UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:09-CR-572-T-30-TGW

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

MARK ANTHONY MYRIE,

    Defendant.
_____/

**DEFENDANT MARK MYRIE'S MOTION TO DISCLOSE THE IDENTITY
OF THE PAID, CONFIDENTIAL SOURCE
AND INCORPORATED MEMORANDUM OF LAW**

    The defendant, Mark Anthony Myrie, through undersigned counsel, respectfully moves this Court, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, the Due Process Clause of the Fifth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment, for an order compelling the government to disclose the identity and location of the confidential informant who was an eyewitness and participant in the events which are the subject of both counts of the Indictment herein. In support of this motion, Mr. Myrie states the following:

    1.    On December 15, 2009, a federal grand jury in the Middle District of Florida indicted the defendant on two counts. Count One alleges that Mr. Myrie and two co-defendants conspired to possess with intent to distribute five (5) kilograms or more of cocaine from an unknown date to December 10, 2009, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two alleges that Mr. Myrie aided and abetted his co-defendants in knowingly and intentionally possessing a firearm

during the course of activity charged in Count One, in violation of 18 U.S.C. §§ 2 and 924(d).

2.    Although the Indictment itself is bareboned, the government initially secured a Criminal Complaint against Mr. Myrie based upon an affidavit submitted to Magistrate Judge Elizabeth Jenkins by DEA Special Agent Daniel P. McCaffrey. *See* **Exhibit 1**. Special Agent McCaffrey's recitation of the relevant facts, however, do not start until December **8**, 2009, when he first received information from a "Confidential Source" ("CS") that Mr. Myrie "and associates wanted to purchase kilogram amounts of cocaine..." McCaffrey Affidavit, at p. 1. The Affidavit omits all information concerning the CS's conduct before December 8, 2009.

3.    On July 26, 2009, Mr. Myrie – a well-known reggae musician, recording artist and 2010 Grammy nominee known in the music industry as "Buju Banton" – boarded a flight from Madrid, Spain to Miami, Florida. By sheer chance, bad luck, or other reason to which the defendant is unaware, the passenger occupying the seat next to him was the CS. Prior to meeting the CS on the flight, he had never spoken to, met with or even heard of the CS.

4.    The CS is a paid government informant. In addition to refusing to disclose the CS's identity, the government has refused to identify the prior cases in which he has been involved, the outcomes of those cases, the amount of money he has earned making cases for the government, or even the amount he has been paid (or expects to be paid) in this case.

5.    During the long international flight to Miami, the CS, after softening up Mr. Myrie with small talk, began discussing cocaine. Throughout the flight, the CS tried to interest Mr. Myrie in buying cocaine. Mr. Myrie, however, was not interested. To Mr. Myrie's knowledge, the CS did not record this long encounter with Mr. Myrie. *The government has not disclosed any reports*

*concerning this exculpatory encounter with the CS.*

    6.    The CS did not give up, however. After all, his livelihood depended on it. Accordingly, over the course of the next five (5) months, the CS repeatedly called Mr. Myrie in repeated attempts to convince him to participate in a cocaine conspiracy with him. Some *but not all* of the CS's attempts to ensnare Mr. Myrie were tape recorded. The ones that were recorded have been disclosed in discovery but have not been transcribed. However, counsel has listened to them, and the tapes repeatedly show Mr. Myrie's attempts to put off the CS.

    7.    During the plane ride, the CS managed to convince Mr. Myrie to meet him at a restaurant on Las Olas Boulevard in Ft. Lauderdale the following day, July 27, 2009. It was *the CS who brought up the subject of cocaine.* Two days later, on July 30, 2009, the CS called Mr. Myrie at 1:21 p.m. in an attempt to confirm another lunch meeting but *Mr. Myrie told the CS that he could not make it*. The CS tried again on August 4, 2009, but *Mr. Myrie dodged him by telling the CS to call back later*.

    8.    The CS, however, was persistent and called Mr. Myrie the next day, August 5, 2009. However, *Mr. Myrie told the CS that he could not make it*, that he was meeting his band for a rehearsal in New York and was catching a flight after that.

    9.    The CS tried yet again on September 3, 2009, but *Mr. Myrie told him that he was leaving for London*. On September 12, 2009, the CS called Mr. Myrie again but *Mr. Myrie said that he was in Philadelphia on tour and was not coming back to Florida for awhile*.

    10.    On October 14, 2009, the CS called asking for 2 tickets to a concert on October 31, 2009, and to see him backstage. Mr. Myrie told the CS he was in California and would call him.

    11.    The CS and DEA tried to finalize the sting in December. However, on December 4,

2009, *Mr. Myrie told the CS that he could not make the meeting*, that he was waiting for a car and would not drive 2 hours to a meeting. The CS then told Mr. Myrie that he had to go to Houston and needed to talk to Mr. Myrie in the beginning "so if you come it will be different, that will change a lot of things and start things." The CS was relentless and pleaded for Mr. Myrie come, telling him that the "key is for us to meet him to make an effort it will be it worth it for you to come." Nonetheless, *Mr. Myrie still said he could not make it until the morning and would call the CS then*. Mr. Myrie did not go to any meeting.

12. Finally, on December 8, 2009, the CS was successful in convincing Mr. Myrie to meet with him. Just to make sure Mr. Myrie attended, at 12:50 p.m. the CS called Mr. Myrie. However, the tape of the call reflects Mr. Myrie did not want to meet. Nonetheless, according to the Complaint, Mr. Myrie attended the meeting at 2:29 p.m. at an "undercover warehouse." *See* McCaffrey Affidavit, at p. 3. At this preliminary meeting, the CI showed Mr. Myrie and a codefendant a brick of cocaine.[1] *Id.* at p. 4. Mr. Myrie then went back to Miami.

13. Over the next two days, December 9-10, 2009, co-defendants Thomas and Mack continued to meet and talk to the CS. These discussions and meetings culminated in Thomas and Mack returning to the undercover warehouse, at which time they were arrested. *Id.* at pp. 5-6.

## MEMORANDUM

*Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623 (1957), describes the circumstances under which the government's privilege to withhold the identity of those who furnish information

---

[1] Every aspect of this case was controlled by the government, from the CS's attempts to generate the crime to the agents supplying the means for it to occur.

about violations of the law to law enforcement authorities must yield to a defendant's fundamental right to a fair trial. While an informant's identity will often be privileged from disclosure, there are limits to the scope of that privilege arising from–

> – fundamental requirements of fairness. *Where the disclosure of an informer's identity or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.* In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

*Roviaro*, 353 U.S. at 60-61 (emphasis added; footnotes omitted). The Court determined that "no fixed rule with respect to disclosure is justifiable." *Id* at 62. Rather–

> – the problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.*

In *United States v. Gutierrez*, 931 F.2d 1482 (11th Cir. 1991), *cert. denied*, 353 U.S. 53, 112 S.Ct. 321 (1992), the Eleventh Circuit identified three factors to utilize in approach the balancing test articulated by the Supreme Court in *Roviaro*:

(1) The extent of the informant's participation in the criminal activity;

(2) The directness of the relationship between the defendant's asserted defense and the probable testimony of the informant; and

(3) The government's interest in nondisclosure.

*Gutierrez*, 931 F.2d at 1490. *Accord United States v. Flores*, 572 F.3d 1254, 1265 (11th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct. 561 (2009); *United States v. Tenorio-Angel*, 756 F.2d 1505, 1509

(11th Cir. 1985).

The Complaint, counsel's evaluation of the evidence to date and Mr. Myrie's obvious entrapment defense plainly satisfy his burdens under the first two prongs of the Eleventh Circuit" test. While it is true that courts have permitted the government to keep an informant's identity secret when the informant is only peripherally involved in the events or is a mere tipster, this is clearly not such a case. *See, e.g., Flores*, 572 F.3d at 1265 (affirming district court's decision not to require disclosure where "the confidential informant did not participate in any of the criminal activities listed in the indictment"); *United States v. Rodriguez*, 312 Fed. Appx. 205, 210 (11th Cir. 2009) (disclosure not required where the informant Carlos "had, if any, a momentary interaction with Rodriguez at the gas station and Carlos did not directly incriminate Rodriguez); *United States v. Diaz*, 655 F.2d 580 (5th Cir. Unit B 1981) (*Roviaro* does not require disclosure of a mere tipster's identity), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1257 (1982); *United States v. Fischer*, 531 F.2d 783, 787 (5th Cir. 1976) (same).

Nor is this a case where the informant was *always* accompanied by a government agent or where *all* of his meetings and telephone calls with the defendant were recorded. *Cf. Gutierrez*, 931 F.2d at 1491 (distinguishing *Roviaro* where the informant Velez "was always with at least one government agent who could testify to everything which occurred except for a few instances in which Velez spoke with the appellants while no government agent was present"); *Diaz*, 655 F.2d at 75 (no disclosure required where informant merely introduced undercover agents to the defendant); *Kerris*, 748 F.2d at 614 (same). In this case, the CS was present during and participated in *every* phone call and meeting that Mark Myrie supposedly participated in.  And, the CS had many conversations with Mr. Myrie that were not recorded – the most critical of which was probably the

initial conversations on the air flight from Spain to Miami.

*Roviaro* itself involved similar facts. In *Roviaro*, the defendant was convicted of the sale of heroin and of knowing concealment and transportation after importation of heroin. An informant was involved in the events leading to *Roviaro's* arrest. During a material part of the criminal crime, a police officer hid in the trunk of a car while *Roviaro* and the informant engaged in a conversation about the drug deal and the informant drove to the pick-up point. At trial, the informant's part in the transaction was described by government witnesses and an officer testified about the informant's conversation with *Rovario*, which the officer overheard. *Rovario* sought disclosure of the informant's identity, and when the government refused, the district court did not compel disclosure. The Supreme Court, however, reversed. The Court found that the charge against *Roviaro*, "when viewed in connection with the evidence introduced at the trial, is so closely related to [the informant] as to make his identity and testimony highly material." As the Court explained, "the circumstances of this case demonstrate that [the informant's] possible testimony was highly relevant and might have been helpful to the defense." *Id.* at 63-64. The defendant's ability to cross-examine the police officers involved was–

> – hardly a substitute for an opportunity to examine the man who had been nearest to him and took part in the transaction. *[The informant] had helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment.* He might have thrown doubt upon petitioner's identity or on the identity of the package. He was the only witness who might have testified to petitioner's possible lack of knowledge of the contents of the package that he "transported" from the tree to [the informant's] car. The desirability of calling [the informant] as a witness, or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide.

*Id.* at 64 (emphasis added). The Court believed that the government's use at trial of the defendant's

conversation with the informant–

> – particularly emphasizes the unfairness of the nondisclosure in this case. The only person, other than petitioner himself, who could controvert, explain or amplify [the officer's] report of this important conversation was [the informant]. *Contradiction or amplification* might have borne upon petitioner's knowledge of the contents of the package or *might have tended to show an entrapment.*

*Id.* (emphasis added).  The Court reversed the conviction and remanded the case to the district court. *Id.* at 66.

In applying *Roviaro* to cases where a defendant seeks the identity of the informant in order to pursue an entrapment defense, the former Fifth Circuit has held that "the defendant must produce 'some evidence, but more than a scintilla that (he was) induced to commit the offense.'" *United States v. Gonzalez*, 606 F.2d 70, 75 (5th Cir. 1979), quoting *United States v. Groessel*, 440 F.2d 602, 606 (5th Cir.), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2263 (1971).  This means that the defendant or his counsel must "'make an initial proffer on his entrapment defense'" in order to show a legitimate need for the disclosure.  *Gonzalez*, 606 F.2d at 75, quoting *Alvarez v. United States*, 525 F.2d 980, 982, (5th Cir.), *cert. denied*, 425 U.S. 995, 96 S.Ct. 2209 (1976).

The factual portion of the instant motion is surely enough to satisfy the minimal showing required of a defendant.[2]  The CS in this case did much more than tip off the government regarding

---

[2] Under Eleventh Circuit precedent, the Court should conduct an *in camera* hearing if it lacks the information necessary to determine if disclosure of the informant's identity is sufficiently important for the defense. *See United States v. Rutherford*, 175 F.3d 899, 902 (11th Cir. 1999) (remanding for an *in camera* hearing ); *United States v. Panton*, 846 F.2d 1335, 1337 (11th Cir. 1988) (same); *United States v. Freund*, 525 F.2d 873, 877-78 (5th Cir. 1976) (remanding case for an evidentiary hearing to determine whether *Roviaro* required disclosure where the informant was simply a witness to an alleged improper search), *cert. denied*, 426 U.S. 923, 96 S.Ct. 2631 (1976); *Gaines v. Norman*, 662 F.2d 1364 (10th Cir. 1981) (same)., *Cf. United States v. Kerris*, 748 F.2d 610, 614 (11th Cir. 1984) ("recognizing that "[a]n *in camera*

Mr. Myrie's purported interest in joining a cocaine conspiracy. The CS set up the deal. He was a necessary party to the telephone negotiations which led to the attempted sale – some of which were not recorded. The informant was clearly an "active participant" in the entire chain of events. The facts and circumstances of the CS's contacts with Mr. Myrie display a deliberate effort by a paid informant to ensnare a perfect stranger who happened to be sitting next to him on an international flight into committing a crime, thereby ensuring the informant more money. The fact that this long initial encounter between the CS and Mr. Myrie was not recorded underscores the importance of disclosure and the unfairness of concealment. Courts have recognized the important of such preliminary discussions for a successful entrapment defense. *See Diblasio v. Keane*, 932 F.2d 1038 (2d Cir. 1991) (requiring retrial where trial court refused to compel the presence of informant, despite entrapment defense, holding that "when the defendant raises the defense of entrapment, or claims that he did not have the requisite state of mind for the offense charged, testimony about events preceding and in between these crimes may be as material as that detailing their actual commission, or more so") (citations omitted).

Similarly, the fact that the CS was no ordinary informant but a regularly paid one is important. Counsel should not only be permitted to cross-examine the CS about how the source of his livelihood motivated him to try to ensnare Mr. Myrie but also about how his "experience" at ensnaring people has made him adept at doing so. "The jury has the right to know what may be motivating a witness, especially a government paid, regularly employed, informant-witness"

---

hearing may be helpful in balancing the interest of the appellants against those of the government" but is not automatically required "whenever the identity of an informant is requested").

including amounts obtained by the informant in *unrelated* cases. *United States v. Williams*, 954 F.2d 668, 672 (11th Cir. 1992). Paid informants are "a sub-class of interested witnesses" since they are "not disinterested witnesses." Sand, Siffert, Loughlin & Reiss, *Modern Federal Jury Instructions*. Volume 1, ¶ 7.01, p. 7-42 (1990). For this reason, the Eleventh Circuit's pattern instructions inform juries that the activities and statements of paid informants must be viewed with particular care.[3] The fact that Mr. Myrie ultimately refused to participate in the conspiracy after the initial meeting further shows the viability of his entrapment defense. *Cf. United States v. Vizcarra-Porras*, 889 F.2d 1435, 1438 (5th Cir. 1989) (where defendant "decided to do the deed" informant's testimony would not have been helpful and therefore his identity did not need to be disclosed).

In *McLawhorn v. State of North Carolina*, 484 F.2d 1, 7 (4th Cir. 1973), the court held that when an informant is a participant in a criminal enterprise, a defendant is not even required to present proof of his need for the informant's testimony because that would "place an unjustifiable burden on the defense," particularly where alleged entrapment is contrived and perpetrated by the informant. *McLawhorn* also recognized that informants often have a pecuniary interest in the arrest of the defendant, which increases the risk of entrapment. *Id.* at 7 n. 18. The informant in

---

[3] The requirement for the issuance of such an instruction was derived from the Eleventh Circuit's opinion in *United States v. Beard*, 761 F.2d 1477 (11th Cir.), *cert. denied*, 474 U.S. 907 (1985). In *Beard*, the Eleventh Circuit held that when a criminal case rests upon the credibility of a government informant, a defendant is entitled to a special cautionary instruction if he requests it. The court explained that the rationale behind this "requirement" was to ensure that verdicts were not predicated upon the testimony of witnesses "who may have good reason to lie." 761 F.2d at 1481, quoting *United States v. Garcia*, 528 F.2d 580, 588 (5th Cir. 1976). *See also United States v. Goff*, 847 F.2d 149, 161 (5th Cir. 1988) ("the trial court must give the jury careful instructions pointing out the suspect credibility of a fact witness who has been or expects to be compensated for his testimony"), *citing United States v. Cervantes-Pacheco*, 826 F.2d 310, 316 (5th Cir. 1987) (relying upon *Beard*), *cert. denied sub nom. Nelson v. United States*, 108 S.Ct. 749 (1988).

*McLawhorn* "participated" in the criminal incident through attempting to arrange a sale of drugs by the defendant, meeting with him in private, introducing him to the federal agent, riding in a car with the agent and the defendant and participating in the sale. *Id.* at 6. The court concluded that under these circumstances, the trial court had erred in refusing to compel disclosure of the informant's identity. *Id.  Accord United States v. Price*, 783 F.2d 1132 (4th Cir. 1986) (reversing conviction where district court withheld identity of informant who was an active participant in crime throughout); *United States v. Roberts*, 388 F.2d 646, 648-49 (2d Cir. 1968) ( *United States v. White*, 324 F.2d 814 (2d Cir. 1963) (ordering testimony of informant in order to help defendant present entrapment defense); *United States v. Pesaturo*, 519 F. Supp. 2d 177, 186 (D. Mass. 2007) ("In light of the entrapment defense asserted, the identity of the informant is clearly relevant and helpful to the Defendant's defense" since "the Defendant cannot make out or prepare his entrapment defense if the Government does not disclose the identity of the informant...").

With respect to third and final element of the Eleventh Circuit's test, we know of no valid interest the government may have in non-disclosure. *Roviaro v. United States*, 353 U.S. at 60. Moreover, as an evidentiary privilege, it must not be "expansively construed to excuse an individual's testimonial obligation, because such privileges create an inherent tension with society's legitimate interest in complete disclosure of the truth." *Matter of Grand Jury Investigation*, 922 F.2d 1266, 1270 (6th Cir. 1991).

The government virtually always invokes two "interests" for keeping an informant's name secret: (1) the physical safety of the informant and (2) the informant's participation in other, ongoing cases. *Flores*, 572 F. 3d at 1265 (ongoing investigations); *Rodriguez*, 312 Fed. Appx. at 211. Whichever one the government intends to invoke, the Court must bear in mind that the government

has the burden of demonstrating a *factual* basis for any desire to shield its informants. *Fischel*, 686 F.2d at 1091. *See, e.g., United States v. Vann*, 336 Fed. Appx. 944, 950 (11th Cir. 2009) (government had a strong interest in nondisclosure where "at least one of the CIs was threatened after the search warrant was executed"); *Gutierrez*, 931 F.2d at 1491 (government established interest in nondisclosure through an affidavit indicating that threats had been made by and on behalf of other defendants in the case). Where "safety concerns ... appear to be more speculative than real," the Court should reject them. *Pesaturo*, 519 F. Supp. 2d at 186. A similar rule applies in civil rights cases where the government invokes law enforcement privileges. There, as here, the government must explain the alleged reasons for nondisclosure "with particularity." *King v. Conde*, 121 F.R.D. 180, 189-190 (E.D.N.Y. 1988). "Conclusor[y]" assertions are insufficient. *Id.* The Court should be "wary" of unsupported assertions of the need for secrecy. *Id.* at 192. *Accord MacWade v. Kelly*, 230 F.R.D. 379, 381 (S.D.N.Y. 2005) ("To sustain the invocation of such a privilege . . ., [the party invoking the privilege] must make a clear showing of harm if the information is disclosed.") (quoting *Galvin v. Hoblock*, No. 00 Civ. 6058 (MHD) (S.D.N.Y. Sept. 24, 2003), *2003 U.S. Dist. LEXIS 16704,* at *3); *Scott v. Edinburg*, 101 F. Supp. 2d 1017, 1021 (N.D. Ill. 2000) (rejecting assertion that disclosure of police documents would "chill" police departments); *Disidore v. Mail Contractors of Am., Inc.*, 196 F.R.D. 410, 413 (D. Kan. 2000).[4]

---

[4] The court in *King* noted that there was "no empirical evidence" to support the government's usual response in civil litigation that disclosure of internal agency documents would somehow "chill" government operations. *King*, 121 F.R.D. at 193. *Accord Kelly*, 114 F.R.D. at 664-65. Indeed, the court found that the opposite was more likely to be true; the threat of disclosure "may serve to ensure that these investigations are carried out in an evenhanded fashion." *King*, 121 F.R.D. at 193. *See also Wong v. City of New York*, 123 F.R.D. at 483 ("if the fear of disclosure in civil rights lawsuits does have some real effect on officers' candor, the stronger working hypothesis is that fear of disclosure is more likely to increase candor than to

If the government is concerned about disclosing the CS's identity because it would allegedly jeopardize another ongoing investigation, other measures short of nondisclosure are available. In this regard, the government bears the burden of demonstrating that a protective order limiting disclosure to counsel would not be sufficient to protect the law enforcement interests asserted. *King v. Conde*, 121 F.R.D. 180, 189-190 (E.D.N.Y. 1988). "Such an order can mitigate many if not all of the oft-alleged injuries to the police and to law enforcement." *Id. Accord Clark v. Township of Falls*, 124 F.R.D. 91, 94 (E.D. Pa. 1988); *Kelly v. City of San Jose*, 114 F.R.D. 653, 666 (N.D. Cal. 1987): *Mercey v. County of Suffolk*, 93 F.R.D. 520, 524 (E.D.N.Y. 1982). "Unless the government, through competent declarations, shows the court *what interests* [of law enforcement or privacy] would be harmed, *how* disclosure under a protective order would cause the harm, and *how much* harm there would be, the court cannot conduct a meaningful balancing analysis." *Kelly*, 114 F.R.D. at 669 (emphasis in original). *Accord King*, 121 F.R.D. at 189.[5]

We suspect that the real reason the government does not wish to disclose the identity of the CS is because the government is trying to avoid the consequences of the jury learning about the activities of its paid informant and how much he has earned through those activities. However, as the Eleventh Circuit emphasized in *Williams*, that the jury is entitled to know the full amount, no matter how prejudicial to the government's case:

---

chill it"); *Mercy v. County of Suffolk*, 93 F.R.D. 520 (E.D.N.Y. 1982) ("limited disclosure" serves policy of ensuring proper police conduct through self-evaluation); *Wood v. Breier*, 54 F.R.D. 7, 13 (E.D. Wisc. 1972) (doubting the existence of "real world" harm to police department's internal investigations from disclosure).

[5] However, the Court should not grant such a protective order absent a strong showing by the government that even these restrictions are necessary. *King*, 121 F.R.D. at 190 (citations omitted).

> If the amount paid an informant is felt by the government to be too prejudicial for an American jury to hear about, the solution is for the government to make reasonable payments; the solution is not for the court to rule the evidence irrelevant as too prejudicial. We have never approved a rule which makes small payments to informants admissible, but large, outrageous payments inadmissible. The large and outrageous payments may be just the kind that are of the most help to the jury in arriving at the truth.

*Williams*, 954 F.2d at 672.

Finally, the Court must balance the government's mere privilege against the *constitutional* rights of Mr. Myrie. He has a constitutional right to equal access to essential witnesses. The right of access is fundamental to our system of justice and is guaranteed by the Fifth and Sixth Amendment rights of confrontation, compulsory process, due process and effective assistance of counsel. *See generally United States v. Fischel*, 686 F.2d at 1092; *United States v. Opager*, 589 F.2d 799, 804 (5th Cir. 1979); *Coppolino v. Helpern*, 266 F. Supp. 930, 935 (S.D.N.Y. 1967). "[T]he suppression of witnesses by the government violates the due process clause." *United States v. Pepe*, 747 F.2d 632, 654 (11th Cir. 1984). *See also United States v. Valenzuela-Bernal*, 458 U.S. 858, 872-73 (1982) (a defendant's constitutional rights to due process and compulsory process violated where he can make a plausible showing that deportation of witnesses deprived him of "material and favorable" testimony). As demonstrated above, the CS's testimony is critical to Mr. Myrie's bona fide entrapment defense.

WHEREFORE, the Court should order the government to identify the name of the CS, his location, and how much money he has been paid in this case and his other cases.

Respectfully submitted,

DAVID OSCAR MARKUS, PLLC
169 East Flagler Street, Suite 1200
Miami, FL 33131
Tel: (305)379-6667
Fax: (305)379-6668
www.markuslaw.com

By:   /s/ David Oscar Markus
      DAVID OSCAR MARKUS
      Florida Bar Number 119318
      DMarkus@MarkusLaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was e-filed this 26th day of January 2010, and served on all appropriate parties through that system.

/s/ David Oscar Markus
DAVID OSCAR MARKUS
