UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:09-cr-572-T-30TGW

**UNITED STATES OF AMERICA**

-vs-                                    20 September 2010
                                            9:20 a.m.
**MARK MYRIE,**                         Courtroom 13A

            Defendant.
--------------------------/

TRANSCRIPT OF PROCEEDINGS
*(EXCERPTS OF JURY TRIAL)*
**BEFORE THE HONORABLE JAMES S. MOODY, JR.,
UNITED STATES DISTRICT COURT JUDGE**

<u>APPEARANCES</u>

**For the Government:      JAMES C. PRESTON, JR., ESQUIRE**
                          *Assistant United States Attorney*
                          *United States Attorney's Office*
                          400 North Tampa Street
                          Suite 3200
                          Tampa, Florida 33602
                          Phone: (813) 274-6000
                          james.preston@usdoj.gov

**For the Defendant:      DAVID O. MARKUS, ESQUIRE
                          MARGOT MOSS, ESQUIRE
                          ROBERT HIRSCHHORN, ESQUIRE**
                          *David Oscar Markus, PLLC*
                          PH 1
                          40 Northwest 3rd Street
                          Miami, Florida 33128
                          Phone: (305) 379-6667
                          Fax: (305) 379-6668
                          dmarkus@markuslaw.com

*(appearances continued on next page)*

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

**MARC DAVID SEITLES, ESQUIRE**
*Law Offices of Marc D. Seitles*
Courthouse Center
40 Northwest 3rd Street
Penthouse 1
Miami, Florida 33128
Phone: (305) 403-8070
Fax: (305) 403-8210

ALSO PRESENT        **MARK MYRIE (Defendant)**
MARIE MILLER **(Paralegal Specialist**
      with the U.S. Attorney's Office)
SARA BOSWELL (Courtroom Deputy Clerk)
DAVID ADKINS (Court Security Officer)
FRANK DOHERTY (Court Security
      Officer)

REPORTED BY        SHERRILL L. JACKSON, RPR
*Federal Official Court Reporter*
801 North Florida Avenue
Suite 13A
Tampa, Florida 33602
Phone:  (813) 301-5041

*INDEX TO PROCEEDINGS*

Page

Opening Statement of Mr. Preston.........................3

DANIEL McCAFFREY

  Cross-Examination by Mr. Markus.......................12

CERTIFICATE OF REPORTER................................31

*INDEX TO EXHIBITS*

(None offered or received)

***SHERRILL L. JACKSON, RPR***
***Federal Official Court Reporter, U.S. District Court***
***Middle District of Florida, Tampa Division***

```
 1              P R O C E E D I N G S          (9:20 a.m.)

 2     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

 3           THE COURT:  The Government may proceed.

 4           MR. PRESTON:  "Do you have any contacts where I

 5     can get cocaine?" words spoken by the Defendant, Mark Myrie,

 6     also known as "Buju Banton," to Alexander Johnson on July

 7     27th of 2009 after Alexander Johnson advised the Defendant

 8     that he, Alexander Johnson, only transported drugs.

 9           You will learn of a very important distinction in

10     the motivation of these two men from that July 27th meeting

11     and from other evidence in this case.

12           Alexander Johnson, a confidential source working

13     for the Drug Enforcement Administration and the Sarasota

14     Police Department, while posing as a drug transporter, was

15     looking to enter an established cocaine-smuggling venture

16     that the Defendant, Myrie, was already a part of.

17           The Defendant Myrie's motivation was to use

18     Alexander Johnson to secure cocaine for sale so that the

19     Defendant could make more, new, and different money through

20     a new conspiracy that he was shopping for, apart from the

21     3,000-kilogram cocaine-smuggling venture that the Defendant

22     Myrie had already financed.

23           That motivation of the Defendant Myrie led to the

24     December 10th, 2009, undercover sale of 5 kilograms of

25     cocaine and the arrest of the Defendant Myrie and the
```

1   co-conspirators who came for the cocaine.

2          Good afternoon.  As you learned this morning, my

3   name is Jim Preston.  Since 1989, I've had the pleasure of

4   representing the United States in prosecutions --

5          MR. MARCUS:  Objection, Your Honor.

6          MR. PRESTON:  -- in prosecutions in this --

7          THE COURT:  Sustained.

8          MR. PRESTON:  -- in this courthouse.

9          As an Assistant United States Attorney, I have the

10  burden of proof in this case, and as I told you this

11  morning, I gladly accept that burden and I will meet that

12  burden, the burden of proving the crimes charged beyond and

13  to the exclusion of every reasonable doubt.

14         The evidence in this case will show that two or

15  more persons in some way or manner came to a mutual

16  understanding to try to accomplish a common and unlawful

17  plan, that plan being the possession with intent to

18  distribute 5 or more kilograms of a controlled substance

19  called "cocaine."

20         The evidence will also show that the Defendant

21  Myrie, knowing the unlawful nature of the plan, willfully

22  joined in it.  The evidence will further show that a

23  co-conspirator in this case possessed a firearm, a tool of

24  the trade, during the conspiracy, an act that was reasonably

25  foreseeable to and attributable to the Defendant Myrie.

1           The evidence in this case will reveal the

2    motivation I just discussed and establish the Defendant's

3    absolute and clear predisposition to engage in another

4    avenue of drug trafficking with new associates, known and

5    unknown to him.  The evidence will reveal his other

6    occupation aside from entertainment.

7           The Defendant, you will learn, needed to bring his

8    own connection to accomplish this goal.  As he understood

9    and you will learn, that while the confidential source,

10   Alexander Johnson -- you may also hear the term "CS" -- and

11   the CS could obtain cocaine, neither man appeared to have

12   the immediate ability to sell it without help.

13          The Defendant, you will learn, introduced a friend

14   of his, Ian Thomas, to the confidential source, Mr. Johnson,

15   to fill that void.

16          The evidence in this case starts with a chance

17   meeting on July 26th of 2009 aboard a flight from Madrid to

18   Miami.  Alexander Johnson, who had never heard of the

19   Defendant before, was seated beside the Defendant on that

20   flight.

21          As the two men conversed, the conversation moved

22   to, among other things, drug smuggling.  Alexander Johnson

23   described how he could and did handle shipments of cocaine,

24   and the Defendant described how he was already involved in a

25   cocaine-smuggling venture from Venezuela to St. Martin to

1  Europe.  The two men exchanged numbers and agreed to meet on

2  the following day, July 27th of 2009.

3        You will learn that Alexander Johnson was not in

4  the drug-transportation business in 2009 but played that

5  role in an undercover capacity, because, as I've already

6  mentioned, he was a confidential source.  He has been a paid

7  informant working for the Drug Enforcement Administration

8  and other federal, state, and international law-enforcement

9  agencies since 1996 when he was released from prison on a

10  reduced sentence and had his supervision terminated early.

11        He has not been deported from the United States as

12  a Columbian citizen to his native Columbia because of his

13  cooperation.  You will learn that since 1996, Alexander

14  Johnson has earned over $3.3 million in this risky business

15  of his.  His familiarity with the drug trade started in the

16  late 1980s when he was involved with cocaine smugglers.

17        He got caught in 1994, was prosecuted, and

18  cooperated with law enforcement.  He received substantially

19  less time than he should have received based on that

20  cooperation, and he has continued that cooperation since.

21  His continued work with law enforcement has resulted in

22  countless arrests, prosecutions, and seizures in the

23  millions of dollars.

24        He has been in a long-running dispute with the IRS

25  over taxes, how much money he owes on the money he's made,

1    and is currently in bankruptcy proceedings.

2            You will meet Alexander Johnson in this case as he

3    will testify during the course of this trial, and you will

4    hear some of the recorded conversations he had with the

5    Defendant and others, as well as see video recordings of

6    meetings that took place.

7            "Do you have any contacts where I can get

8    cocaine?" again words from the mouth of the Defendant in a

9    recorded conversation that took place during this July 27th,

10   2009, meeting.

11           The Defendant asked this after Alexander Johnson

12   had just stated, "Let's be clear.  I only transport."

13   Johnson told the Defendant that he prefer the Defendant buy

14   his own stuff for Johnson to handle.  The Defendant

15   insisted, "I give you my money.  You buy.  You sell.  Give

16   me money."

17           The two discussed prices, and the Defendant told

18   Johnson, "That's what we need to work on," and, as the

19   Defendant explained, "I only finance."

20           The two men met again in the Fort Lauderdale area

21   on August 1st, 2009, at a Marriott on the beach.  Johnson

22   was still pursuing the transportation possibilities, but the

23   Defendant made it clear that he was not in a position to

24   plug Mr. Johnson into that already ongoing smuggling venture

25   involving 3,000 kilograms, tens of millions of dollars of

```
 1  cocaine.

 2          In that conversation, you'll hear the Defendant

 3  explain, among other things, as -- excuse me, as he alluded

 4  to on July 27th, "I am an investor, and I don't work with

 5  these cats like that, and I've always been an investor."

 6          The Defendant told Johnson, "If you get me the

 7  connect, we do the buy, and you do all the rest of that

 8  stuff.  We pick up that shit.  You bring money home."

 9          During that August 1st, 2009, meeting, the

10  Defendant also attempted to bring a partner into the plans.

11  The Defendant was trying to make those plans with Alexander

12  Johnson.

13          You will hear the Defendant Myrie tell

14  Mr. Johnson, "I am never going to jail.  I will tell you

15  that straight up.  I'm never going to get mixed up in

16  anything, because what I do is what I do.  I am the best.  I

17  stay on the outside.  Yeah."

18          Now, while the Defendant toured and recorded into

19  December of 2009, he and Alexander Johnson remained in

20  telephone contact, and you will hear some of those calls.

21  The confidential source, Mr. Johnson, had his next

22  face-to-face meeting with the Defendant on December 8th,

23  2009.

24          Alexander Johnson still advised the Defendant that

25  he had a boat to show him, which Mr. Johnson had earlier
```

1    said would be -- could be used for transporting cocaine.  At

2    this stage, the undercover operation was ready to show the

3    Defendant cocaine if that's what he wanted to do.

4            The Defendant came to that meeting, was driven to

5    that meeting on December 8th of 2009 by a long-term friend

6    of his named "Ian Thomas."  When the Defendant learned from

7    Alexander Johnson that Mr. Johnson was prepared to sell

8    cocaine as requested, the Defendant advised that Ian Thomas,

9    who was waiting outside, had the contact to buy and

10   distribute cocaine.

11           Thereafter, the Defendant introduced Ian Thomas to

12   Alexander Johnson, and the distribution possibilities were

13   discussed.  From that meeting which took place in a

14   restaurant here in the Middle District of Florida, Johnson

15   and the Defendant, followed by Ian Thomas, travel to an

16   undercover warehouse in Sarasota.  On the way, the Defendant

17   thanked Alexander Johnson for giving him this opportunity.

18           At the warehouse, you will see a video recording

19   where cocaine was produced, which the Defendant and Ian

20   Thomas inspected, Thomas cutting into a kilogram brick of

21   cocaine with a knife and then handing the knife to the

22   Defendant Myrie, who took his finger and tasted the contents

23   of the knife.

24           Johnson, Thomas, and the Defendant on that video

25   further discussed the deal, which was now to involve a

1   cocaine distribution organization operating out the state of

2   Georgia, which Thomas had the ability to negotiate with.

3           As a result, two days later, on December 10th of

4   2009, co-conspirators Ian Thomas and James Mack were back at

5   that undercover warehouse.  The Defendant, maintaining his

6   on-the-outside method of operation, was home in Miami.

7           The deal was now negotiated to an ice-breaking 5

8   kilograms of cocaine, with plans for future larger

9   transactions.

10          James Mack produced the $135,000 plus in

11  United States currency to make that cocaine purchase from a

12  hidden compartment in his car, the same hidden compartment

13  where a firearm, the subject of Count 2 in the indictment,

14  was seized.  After Mack inspected a kilogram of cocaine, he

15  and Ian Thomas were arrested.

16          The Defendant working from his in-the-trenches

17  position at his home in South Florida, awaiting word that

18  the cocaine train was rolling and he would be profiting, was

19  arrested at his home that same day.

20          Based on this evidence, the Government will have

21  proven and established that Mark Myrie, also known as "Buju

22  Banton," was an established drug trafficker who, while he

23  stayed on the outside, was an important part of the drug

24  ventures he always invested in.

25          The Government will have shown that the Defendant

1    sought this new conspiracy and that as a result of his

2    efforts, this ice-breaking 5-kilogram deal with the goal of

3    future bigger transactions did, in fact, take place.

4           Based on this evidence, ladies and gentlemen, the

5    Government will have met its burden of proof in regard to

6    the two counts in this indictment; and at the conclusion of

7    this case, on behalf of the United States, I will ask you to

8    return verdicts of guilty.

9           Ladies and gentlemen, that's what I'm going to ask

10   at the end of the case; but as we set forth, I ask you to

11   apply your common sense and your careful attention to the

12   evidence presented for your consideration.  If you do that,

13   ladies and gentlemen, the United States can ask nothing

14   more.

15          We ask nothing more, ladies and gentlemen, but the

16   United States of America expects nothing less.

17          Thank you.

18   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

19          THE COURT:  All right, cross?

20          MR. MARCUS:  Good afternoon, ladies and gentlemen.

21          Good afternoon, Agent McCaffrey.

22          THE WITNESS:  Good afternoon.

23          MR. MARKUS:  Your Honor, could I roll that flip

24   board down next to the witness so I can write a couple of

25   things down?

```
 1            THE COURT:  If it has to do with evidence, but not

 2  if it has to do with some summary of yours.

 3            MR. MARCUS:  Maybe I could come to sidebar,

 4  because I don't want to violate the Court's ruling.

 5            THE COURT:  All right.  Approach the bench.

 6            (Bench conference as follows:)

 7            MR. MARKUS:  I just want to, as I ask him

 8  questions, sort of get his answers down in terms of how much

 9  the confidential informant has been paid and so on and write

10  those things down.

11            THE COURT:  No, I won't let you do that.

12            MR. MARCUS:  Okay.

13            (Bench conference concluded.)

14            MR. MARCUS:  May I proceed, Your Honor?

15            THE COURT:  Proceed.

16                          CROSS-EXAMINATION

17  BY MR. MARKUS:

18  Q    Agent, I think you said you were the case agent in this

19  case?

20  A    Correct.

21  Q    That means I think you said the quarterback of the

22  team?

23  A    Correct.

24  Q    You're the most familiar with the facts?

25  A    I'm one of the people familiar with the facts, that's
```

```
 1   correct.

 2   Q    The case agent is the most -- the guy most familiar

 3   with the facts; right?

 4   A    One of the people familiar with the facts, that's

 5   correct.

 6   Q    And you've been investigating this case since July of

 7   '09?

 8   A    That's when it was initially bought to the attention of

 9   my office.

10   Q    And that's when your office started investigating?

11   A    Correct.

12   Q    So, now for over a year?

13   A    Excuse me.

14   Q    You've been investigating for over a year?

15   A    That's correct.

16   Q    All right.  I'd like to talk to you about what that

17   investigation has revealed.  How much -- how much money

18   has -- did Buju Banton invest in this drug deal?

19   A    On the date that the drugs -- the money was seized?

20   Q    Yeah.

21   A    To my knowledge, none.

22   Q    Okay.  So, the $135,000 that was brought to the drug

23   deal, that wasn't Mark Myrie's money?  That wasn't Buju

24   Banton's money; correct?

25   A    To my knowledge, no.
```

```
 1   Q    Okay.  Your knowledge as the case agent shows that

 2   money belonged to James Mack; correct?

 3   A    Well, it doesn't reveal it belonged to him.  He brought

 4   it.

 5   Q    He brought it on behalf of two individuals in Georgia;

 6   correct?

 7   A    That's correct.

 8   Q    Named "Ike" and "Tyke" we know them by?

 9   A    Nicknames, yes.

10   Q    I think you've been investigating those guys, too;

11   correct?

12   A    That's correct.

13   Q    I won't ask you what their real names are, but you've

14   been listening to their phone calls and know their real

15   names; correct?

16   A    We believe so.

17   Q    Okay.  Have you seen any phone calls between -- I will

18   call them "Ike" and "Tyke" and Buju Banton?

19   A    Not that we know of, no.

20   Q    Okay.  Have you seen any phone calls between James Mack

21   and Buju Banton?

22   A    Not that we know of, no.

23   Q    The calls you saw were between Ian Thomas and those

24   fellows; correct?

25   A    We believe that they're calls to those people.  We're
```

```
 1    not sure.
 2    Q    Well, when you say you're not sure, I don't know what
 3    that means.
 4    A    We believe -- he's talking to people on the phone with
 5    nicknames.  We never knew what their phone numbers were.
 6    We're assuming, but we can't be certain who he was talking
 7    to.
 8    Q    Your investigation has led you to believe that they are
 9    people named "Ike" and "Tyke"?
10    A    That's correct.
11    Q    Your investigation has led you to believe these two
12    individuals sent James Mack down with $135,000?
13    A    That's correct.
14    Q    And you have no evidence at all to show that Buju
15    Banton ever spoke with Ike, Tyke, or James Mack?
16    A    That's correct.
17    Q    Okay.  You would agree with me that those three
18    individuals -- Ike, Tyke, and James Mack -- constitute the
19    buyers of the cocaine; correct?
20    A    The buyer portion, yes.
21    Q    They're the buyer portion?
22    A    Yeah.
23    Q    Okay.  And the seller was Alexander Johnson and an
24    undercover police officer?
25    A    That's correct.
```

1  Q    Okay.  Now, we've talked about money going in and that

2  coming from these individuals in Georgia.  Now, let's talk

3  about money coming out.

4  A    Okay.

5  Q    How much money has Buju Banton gotten out of this drug

6  deal on December 10th?

7  A    Zero, because the transaction was never completed.

8  Q    How much was he supposed to get?

9  A    To my knowledge, I don't know.

10 Q    To your knowledge, the answer is zero; correct?

11 A    To my knowledge, I don't know.

12 Q    Okay.  What -- I think you said you listened to all the

13 tape recordings?

14 A    Uh-huh.  Yes, sir.

15 Q    And on those tape recordings, what does it say about

16 Mark Myrie receiving money out of a 5-kilo deal on December

17 10th?

18 A    There was negotiations with him and the CI that -- I'm

19 not sure what's on the recordings.  Per interviewing the CI,

20 he might have mentioned Mr. Myrie expected to get some

21 compensation out of it.

22 Q    Okay.  Let me make sure I understand this.  Nothing on

23 any recording?

24 A    That's correct.

25 Q    And we have recordings starting back in July through

```
 1  December?

 2  A    That's correct.

 3  Q    Okay.  And the CI was recording telephone calls?

 4  A    Correct.

 5  Q    And recording meetings?

 6  A    Correct.

 7  Q    And nowhere on any of these phone calls or meetings

 8  does it say anywhere that Mark Myrie was supposed to get

 9  money out of this cocaine transaction?

10  A    Not on the recordings, but there were some calls that

11  weren't recorded.

12  Q    Okay.  And were you listening on the other line?

13  A    I was not.

14  Q    Well, then we would have to go by the word of the

15  confidential informant; correct?

16  A    That's correct.

17  Q    We would have to go by the word of Alex Johnson?

18  A    That's correct.

19  Q    He decided not to push "record" on a phone call?  Is

20  that what you're telling us?

21  A    That's not correct.

22  Q    In your over one-year investigation into Buju Banton,

23  other than him talking about 3,000-kilo deals and talking

24  about Surinam and these other previous things, what evidence

25  do you have that he did those things?
```

```
 1   A    None.

 2   Q    Well, you've been investigating; right?

 3   A    Excuse me?

 4   Q    You've been investigating; correct?

 5   A    Correct.

 6   Q    You've been asking people about this; correct?

 7   A    Correct.

 8   Q    So, what evidence do we have that he's done these

 9   things?

10   A    None.

11   Q    Just his word?

12   A    Correct.

13   Q    All right.  I think you said this was your first time

14   working with Alexander Johnson?

15   A    This is the first case of mine that he worked on, yes.

16   Q    And you heard the Prosecutor say in his opening

17   statements that he's been paid more than $3.3 million?

18   A    That's correct.

19   Q    He's been paid -- by the way, part of that $3.3 million

20   has been cash payments; correct?

21   A    That's correct.

22   Q    He gets paid as a percentage of the money that's

23   seized?

24   A    Sometimes, yes (nodding head).

25   Q    So, in this case, that cash that we saw pictures of
```

```
 1  that belonged to Ike, Tyke, and James Mack, he would get a
 2  piece of that action?
 3  A    Not that actual money, but yes, he gets paid cash.
 4  Q    Okay.  Why would we pay him in cash?
 5  A    Excuse me?
 6  Q    Why would the DEA pay him in cash?
 7  A    It's easier to do sometimes.
 8  Q    Why is that easier?
 9  A    If it's smaller amounts, it's easier to do, withdraw
10  the money out of our office.
11  Q    Do you file some 1099s and other things so that the IRS
12  knows how much money in cash he's been paid?
13  A    We do not.
14  Q    So, how is the IRS supposed to keep track?
15  A    Every confidential informant that's signed up is told
16  it's their responsibility to report all the money that they
17  receive.
18  Q    In fact, he signs a contract with you-all saying that
19  he promises to report the money that he receives to the IRS?
20  A    He's informed he has to report the money (nodding
21  head).
22  Q    Okay.  You-all don't inform them because you don't do
23  the 1099; he has to keep track himself?
24  A    That's correct.
25  Q    And we just trust him to do that?
```

```
 1   A     We do.

 2   Q     But he hasn't been doing a good job of that, has he?

 3   A     It's my understanding that he's in dispute of exactly

 4   what he owes, not that he doesn't pay taxes.

 5   Q     What does that mean?

 6   A     That's what I was told.  He's in dispute of exactly how

 7   much he owes, not that he doesn't pay taxes.

 8   Q     In other words, he pays some tax but not all of the

 9   money he owes?

10   A     He has put in a claim that he believes he doesn't owe.

11   They believe he owes.  It's a civil dispute between him and

12   the IRS.

13   Q     The IRS says he owes more money?

14   A     To my knowledge, yes.

15   Q     And the IRS says he hasn't been paying the taxes he's

16   supposed to be paying?

17   A     I don't know what the IRS is saying.

18   Q     Haven't you been in touch with the IRS?

19   A     I have not.

20   Q     Didn't the IRS send DEA a lien?

21   A     They sent my office a lien, they did.

22   Q     And that lien said, "Don't pay Alex Johnson money

23   anymore.  Pay us, the IRS, when you're going to give him an

24   award"?

25   A     That's what they requested.
```

```
 1   Q    And that lien was done before you paid him his money in

 2   this case; correct?

 3   A    That's correct.

 4   Q    And then that lien got lifted?

 5   A    Yes.

 6   Q    So you could pay him his money?

 7   A    Yes, sir.

 8   Q    And that -- so, you don't have to give the IRS the

 9   money; you gave it to Alex Johnson?

10   A    I didn't give it to Alex Johnson.

11   Q    The DEA did?

12   A    Correct.

13   Q    How much did it give him?

14   A    I'm not exactly sure.  I think that payment was a

15   little over $30,000.

16   Q    You didn't keep records of that?

17   A    It is in my files, yes, sir.

18   Q    Did you let the IRS know how much you were paying him?

19   A    Yes, sir.

20   Q    Did he let the IRS know?

21   A    You can ask him that.  I don't know.

22   Q    Okay.  Did you keep receipts for his expenses in the

23   case?

24   A    I did not.

25   Q    How did he get paid expenses?
```

```
 1   A     Excuse me?

 2   Q     How did he get paid his expenses?

 3   A     He wasn't paid no expenses.  There were two additional

 4   payments from us on top of the $30,000 payment that I

 5   believe are for information services provided by him.

 6   Q     So, he's gotten a $35,000 payment; correct?

 7   A     Excuse me.

 8   Q     A $35,000 payment?

 9   A     I don't believe it was 35,000.

10   Q     How much was it?

11   A     I'm not sure.  It was less than that.  I want to say

12   32,500, 33,000, somewhere in that ballpark.

13   Q     It's hard to remember all the numbers?

14   A     Excuse me.

15   Q     It's hard to remember all the numbers?

16   A     No, sir.

17   Q     Okay.  So, how much was it?

18   A     He was paid 37,500 for this entire case from DEA.

19   Q     How much from Sarasota?

20   A     I'm not exactly sure of the numbers.

21   Q     Do you know how much DEA paid him in 2009?

22   A     Off the top of my head, no.

23   Q     Do you know how much they paid him in 2008?

24   A     Off the top of my head, no.

25   Q     Now, I think you said that on December 10th, when the
```

```
 1   drug deal occurs between James Mack, Ian Thomas, and Alex
 2   Johnson, you wanted to see where Buju Banton was; correct?
 3   A    That's correct.
 4   Q    Because -- so, you had a call placed to him?
 5   A    That's correct.
 6   Q    He was on the east coast of Florida; correct?
 7   A    Yes, sir.
 8   Q    In Tamarac, Florida --
 9   A    That's correct.
10   Q    -- asleep when he was called?
11   A    I'm not sure he was asleep.
12   Q    You heard the tape; right?
13   A    I heard the tape; that's correct.
14   Q    He sounded like he was asleep?
15   A    He sounded tired.  I'm not sure he sounded asleep.
16   Q    Okay.  He sounded tired.
17        You gave Alex Johnson a phone to call Buju Banton on;
18   correct?
19   A    Correct.
20   Q    Alex Johnson didn't use his own phone to call him?
21   A    Because the battery was dead.
22   Q    He didn't use his own phone to call him?
23   A    Because the battery was dead.
24   Q    So, the answer to my question was he didn't use his own
25   phone to call him?
```

```
 1   A     That's correct.

 2   Q     In fact, he had used his own phone the previous two

 3   days to call Buju Banton; correct?

 4   A     I believe so.

 5   Q     On December 8th and December 9th; correct?

 6   A     Correct?

 7   Q     And Buju Banton did not take his calls; correct?

 8   A     I'm not sure if he answered them or not.

 9   Q     You're the case agent.  Do we have a recording between

10   Alex Johnson and Buju Banton on the phone after that

11   warehouse meeting on the 8th?

12   A     No.

13   Q     And that's because Buju Banton did not take Alex

14   Johnson's calls; correct?

15   A     Because Alex Johnson was also communicating with his

16   co-conspirator, Ian Thomas.

17   Q     Ian Thomas took his calls, didn't he?

18   A     That's correct.

19   Q     Ian Thomas was on the phone with him a lot?

20   A     That's correct.

21   Q     Ian Thomas had met with Alex Johnson a number of times;

22   correct?

23   A     Two more times, yes.

24   Q     And after those meetings -- at one of those meetings on

25   December 9th, Alex Johnson asked Ian Thomas to call Buju
```

```
 1   Banton?  Do you remember that?
 2   A    I do.
 3   Q    And so, they call from Ian Thomas's phone?  Do you
 4   remember that?
 5   A    I do.
 6   Q    And this time Mr. Banton picks up?
 7   A    Correct.
 8   Q    Because he sees his driver, his friend's number on
 9   there?
10   A    Correct.
11   Q    He immediately gets off the phone, doesn't he?
12   A    I don't know what you just said.  I don't know if it
13   was immediately.
14   Q    Within 10 seconds?
15   A    It could have been.
16   Q    And whether it's ten seconds or five seconds, whatever
17   it is, after he gets off the phone, Ian Thomas tells Alex
18   Johnson, "Talk to me.  He's about the music.  He eats,
19   drinks, sleeps," and he says another word, "the music."
20   Isn't that what he said?
21   A    I'm not sure what he said.
22   Q    Well, we're going to listen to the tapes in this trial?
23   A    (Nods head.)
24   Q    Now, let's rewind a little bit to the December 8th
25   meeting in that warehouse.  I think -- would you agree with
```

```
 1   me that you did what's called a surprise flash of the
 2   cocaine at that December 8th meeting?
 3   A      Correct.
 4   Q      In other words, nobody told Ian Thomas or Buju Banton,
 5   "We're going to see cocaine"; correct?
 6   A      Correct.
 7   Q      You wanted to surprise them with it?
 8   A      Correct.
 9   Q      When you surprised them with it, the warehouse door was
10   closed, was it not?
11   A      It was.
12   Q      All right.  After that meeting on the 8th, Buju
13   Banton's only contact with the informant, Alex Johnson, is
14   when he calls from your phone on the 10th; correct?
15   A      That's correct.
16   Q      On the 10th, after that phone call, you arrest Buju
17   Banton?
18   A      Correct.
19   Q      All right.  I assume you search his house?
20   A      I don't know.  I was not there.
21   Q      I assume the agents searched the house?
22   A      I don't believe they did (shaking head).
23   Q      Isn't it normal protocol to make sure for safety and
24   everything that you look around and make sure there's
25   nothing in the house that could injure the agent?
```

```
 1  A    If you're making an entry chasing somebody into a
 2  residence.  They were knocking on doors to see if he was
 3  home.  They were told if they located him, "Advise him he's
 4  under arrest, and take him into custody."
 5  Q    He answered the door in his boxers.  Did you remember
 6  that?  Did you hear that?
 7  A    I was not there.
 8  Q    Did the agents find any drug ledgers that would show
 9  these previous deals that the Prosecutor talked about in his
10  opening?
11  A    Like I said stated, I don't know if they searched his
12  house.  I don't think they did.
13  Q    Did they find any cash or anything else?
14  A    Like I said, I don't believe they searched his
15  residence.
16  Q    So, nothing was found?
17  A    Like I said, they didn't search his house.
18  Q    You also mentioned that Ian Thomas had two different
19  phones that he used?
20  A    Correct.
21  Q    He had one phone that he spoke to Buju Banton on;
22  correct?
23  A    Correct.
24  Q    Then he had his drug phone that he spoke to the
25  confidential informant, Alex Johnson, on; correct?
```

```
 1   A     Correct.

 2   Q     Drug dealers oftentimes use two different phones?

 3   You've had that in your experience; correct?

 4   A     They often use multiple phones.

 5   Q     Buju Banton had one phone, didn't he?

 6   A     That I know of, yes.

 7   Q     Okay.  In your investigation, you've also listened to

 8   jail recordings of James Mack; correct?

 9   A     Correct.

10   Q     James Mack was the person who showed up from Georgia

11   with the money?

12   A     Correct.

13   Q     He also had with him in his car a gun?

14   A     A gun was found in the car he was driving, yes.

15   Q     This is the guy that Buju Banton had never spoken to or

16   heard of prior to the 10th?

17   A     That's correct.

18   Q     And in listening to James Mack's calls, he says that

19   he's never heard of Buju Banton; correct?

20   A     Correct.

21   Q     In terms of the transcripts that the Prosecutor asked

22   you about, whether you've listened to them and reviewed them

23   with Alex Johnson, the transcripts that are going to be

24   provided to the jury aren't the full transcripts, are they?

25   A     They're not.
```

```
 1   Q    You took snippets of transcripts?

 2   A    That's correct.

 3   Q    And cut out the portions you wanted to show them?

 4   A    We did the portions that we took -- we transcribed.

 5   Q    Right.  You didn't transcribe the whole tape?

 6   A    No.  One of the meetings was over three hours long.

 7   Q    Let's talk about that meeting.  That's the first

 8   meeting at Bova Prime; correct?

 9   A    That's correct.

10   Q    In that meeting, they were drinking, weren't they?

11   A    I believe so, yes.

12   Q    A lot?

13   A    I don't know how much they had.

14   Q    The transcripts that you're going to provide to the

15   jury don't start until about two hours and 15 minutes into

16   that meeting; isn't that right?

17   A    Correct.

18   Q    And who brings up cocaine at the 2-hour-and-15-minute

19   mark?

20   A    I'm not sure.  They both speak about it right at the

21   same time.  It might have been the confidential source.

22             MR. MARCUS:  May I approach, Your Honor?

23             THE COURT:  Yes.

24   BY MR. MARKUS:

25   Q    I'm showing you what's been marked 20B (displaying
```

1  item) by the Prosecution.   Do you recognize this transcript?

2  A    I do.

3  Q    And at the two-hour-13-minute mark and 30 seconds, who

4  brings up cocaine?

5  A    The confidential source.

6  Q    Just to circle back and then I will sit down, the very

7  first thing you testified to on direct is that this

8  investigation started out as a smuggling investigation;

9  correct?

10  A    It was a transportation case, yes (nodding head).

11  Q    That's because Alex Johnson told you that Buju Banton

12  talked a lot about transportation; correct?

13  A    That's correct.

14  Q    And just to make sure we're all on the same page, it

15  didn't end up as a transportation case because there's no

16  evidence that Buju Banton ever transported one ounce of

17  cocaine; correct?

18  A    It didn't end up as a transportation case (shaking

19  head).

20  Q    It did or did not?

21  A    It did not end up as a transportation case.

22  Q    Because there's no evidence that he transported even a

23  baggie of cocaine; correct?

24  A    It didn't end up as a transportation case.

25         MR. MARCUS:   I have no nothing further.

```
1    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

2                              - - - - -

3                      CERTIFICATE OF REPORTER

4

5

6         I, SHERRILL L. JACKSON, Federal Official Court

7    Reporter for the United States District Court, Middle

8    District of Florida, Tampa Division,

9         DO HEREBY CERTIFY, that I was authorized to and

10   did, through use of Computer-Aided Transcription, report in

11   shorthand the proceedings and evidence in this cause, as

12   stated in the caption on page 1 of this transcript, and that

13   the foregoing pages numbered 1 to 31, inclusive,

14   constitute a true and correct transcription of my

15   shorthand report of said proceedings and evidence.

16         IN WITNESS WHEREOF I have hereunto set my hand

17   this 20th day of September, 2010.

18
                              s/Sherrill L. Jackson
19                    _____

20                         SHERRILL L. JACKSON, RPR
                         Federal Official Court Reporter
21

22

23

24

25
```