UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:09-cr-572-T-30EAJ

**UNITED STATES OF AMERICA**

-vs-                                                    20 December 2012
                                                            9:30 a.m.
**MARK ANTHONY MYRIE,**                            Courtroom 13A

        Defendant.
------------------------/

TRANSCRIPT OF PROCEEDINGS
*(EVIDENTIARY HEARING)*
**BEFORE THE HONORABLE JAMES S. MOODY, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>APPEARANCES</u>

**For the Government:**     **JAMES C. PRESTON, JR., ESQUIRE**
                            *Assistant United States Attorney*
                            *United States Attorney's Office*
                            400 North Tampa Street
                            Suite 3200
                            Tampa, Florida 33602
                            Phone: (813) 274-6000
                            james.preston@usdoj.gov


**For the Defendant:**      **IMHOTEP ALKEBU-IAN, ESQUIRE**
                            **CHOKWE LUMUMBA, ESQUIRE**
                            P.O. Box 31762
                            Jackson, Mississippi 39286
                            Phone: (601) 353-4455
                            Fax: (601) 353-2818
                            ialkebulan@aol.com
                            clumumbafreelon@aol.com




*(appearances continued on next page)*

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

ALSO PRESENT         MARK ANTHONY MYRIE (Defendant)
                       SARA BOSWELL (Courtroom Deputy Clerk)
                       NONA DYESS (Court Security Officer)

REPORTED BY         SHERRILL L. JACKSON, RPR, FPR
                       *Federal Official Court Reporter*
                       801 North Florida Avenue
                       Suite 13A
                       Tampa, Florida 33602
                       Phone:  (813) 301-5041
                       stenorella@aol.com

## INDEX TO PROCEEDINGS

Page

CHRISTOPHER SWEENEY

   Direct Examination by Mr. Chokwe Lumumba .............. 7

   Cross-Examination by Mr. Preston ..................... 20

   Redirect Examination by Mr. Chokwe Lumumba ........... 22

TERRI WRIGHT

   Direct Examination by Mr. Chokwe Lumumba ............. 26

   Cross-Examination by Mr. Preston ..................... 47

   Redirect Examination by Mr. Chokwe Lumumba ........... 55

STEVEN BOYCE

   Direct Examination by Mr. Chokwe Lumumba ............. 65

JANICE BENOIT

   Direct Examination by Mr. Chokwe Lumumba.............. 70

FRANK ARNONE

   Direct Examination by Mr. Chokwe Lumumba ............. 77

   Cross-Examination by Mr. Preston ..................... 78

CERTIFICATE OF REPORTER ................................ 94

## INDEX TO EXHIBITS

Page

Government Exhibit 1 ................................... 51

Defense Exhibit 2 ..................................... 34

P R O C E E D I N G S     (9:30 a.m.)

1  THE COURT:  Good morning.

2  I'm told that we may have a fire drill this

3  morning, so we'll get started.  If we have a fire drill,

4  we'll do the fire drill procedures; and then when we get the

5  all clear, we'll come back in and restart the hearing.

6  Is Miss Wright in the courtroom -- Miss Terri

7  Wright?

8  MR. PRESTON:  There are some people sitting

9  outside, Your Honor.  I don't know if Miss Wright was among

10  them.

11  THE COURT:  Would you go see if Miss Wright is out

12  there and, if so, ask her to sit in one of the witness

13  rooms, please.

14  Also, tell her about the fire drill.

15  MR. PRESTON:  I apologize for waiting downstairs,

16  Judge, but one of the other judges dismissed everyone from

17  their courtroom, and I was greeted by a fellow assistant,

18  who told us that they were about to have people exit the

19  courthouse.  So, I waited.

20  THE COURT:  Is she in the witness room?

21  COURT SECURITY OFFICER:  Yes, sir.

22  THE COURT:  How 'bout Mr. Sweeney?  Is Mr. Sweeney

23  in the courtroom?

24  Would you bring in Mr. Sweeney, please.

1          (Witness enters the courtroom.)

2          THE COURT:  Come forward and be sworn, please.

3          (The witness was duly sworn or affirmed and

4    responded as follows:)

5          THE WITNESS:  Yes (seated).

6          THE CLERK:  Please state your name and spell your

7    first and last name for the record.

8          THE WITNESS:  Christopher Sweeney -- Christopher

9    Sweeney, C-H-R-I-T-O-P-H-E-R S-W-E-E-N-E-Y.

10         (The witness was duly sworn or affirmed and

11   responded as follows:)

12         THE WITNESS:  I do.

13                      **CHRISTOPHER SWEENEY,**

14   the witness, being sworn or affirmed, testified as follows:

15         THE COURT:  Mr. Sweeney, do you know why you're

16   here?

17         THE WITNESS:  Yes.

18         THE COURT:  Okay.  I understand that you wrote an

19   article quoting that -- that you had interviewed Miss Terri

20   Wright, who served on the jury in the Mark Myrie trial; is

21   that right?

22         THE WITNESS:  Correct.

23         THE COURT:  And she made some statements about

24   outside research she may have done?

25         THE WITNESS:  Correct.

1    THE COURT:  What did she tell you about that?

2    THE WITNESS:  That she, during the -- she said

3 that when the information was so fresh in her mind, she

4 would go to her car, write down the information that was

5 still fresh in her mind, and then go home and look it up;

6 and then she said after the trial, she went and looked up

7 information regarding the first trial.

8    THE COURT:  Did she give you any specific

9 information about what she looked up?

10    THE WITNESS:  She didn't give me specific

11 information about what she looked up; but during the course

12 of the interview, she put me on hold, and it sounded like

13 she dug through some files, and she was talking about the

14 *Pinkerton* rule.

15    THE COURT:  Did she give you any other specifics

16 about what she may have looked up?

17    THE WITNESS:  I'm trying to think.

18    No, not that I can recall.  Just that she would

19 have the information fresh in her brain and then write it

20 down in her car and go home and look it up.

21    THE COURT:  Did she give you any information about

22 whether or not she had shared what she had found with anyone

23 else?

24    THE WITNESS:  She did not.

25    THE COURT:  So, she never made any comments about

1  whether or not she spoke to other jurors about it?

2          THE WITNESS:  No.  She said that she didn't think

3  what she found would have changed anything or something like

4  that.  But I don't recall her saying anything about sharing

5  the information with other jurors.

6          THE COURT:  All right.

7          Would defense counsel like to ask any questions?

8          MR. LUMUMBA:  Good morning, Judge.

9          THE COURT:  Good morning.

10                   *DIRECT EXAMINATION*

11  BY MR. LUMUMBA:

12  Q    Good morning, Mr. Sweeney.

13  A    Good morning.

14  Q    Mr. Sweeney, tell us a little bit about yourself.

15  What -- what is it that you do, or what were you doing

16  during the course of the trial?

17  A    I am a reporter and a journalist.  I started out

18  covering this trial on assignment for *Playboy*.  I attended

19  the entire retrial all days except for when the actual

20  verdict was delivered.

21      During the course of the reporting, I accepted a job

22  with the *Miami New Times*, so my story for *Playboy* kind of

23  shifted to more of a Miami emphasis.  So, I moved down to

24  Miami.

25      I was a staff writer for the *New Times*, which has

1   papers in Broward County and Miami County -- Miami-Dade; and

2   I reported kind of everything from the retrial through the

3   appeals to post-interviews with jurors.

4   Q    Okay.  As a -- where -- what city do you live in

5   currently?

6   A    I recently moved to Boston.  I was with the *New Times*

7   until December 7th, and then last week I moved to Boston.

8   Q    Okay.  So, you covered the Mark Myrie trial?

9   A    Correct.

10  Q    Okay.  And did you cover it for the *Times*?

11  A    Well, I was covering it for *Playboy*, and then it

12  shifted to the *New Times*.

13  Q    Okay.  And did you have any -- in connection with your

14  coverage of the Myrie trial, who did you-all interview?

15  A    Who did I interview?

16  Q    Or attempt to interview.

17  A    Uh, many people.  I interviewed the defense attorney,

18  the jurors -- a few handful of jurors.  I interviewed -- I'm

19  trying to think.  Sorry -- a priest.  I can't remember his

20  name, but he was a priest who had provided services to Mark

21  Myrie.  I interviewed a Jamaican professor.  I reached out

22  to the DEA, spoke with their public-information officer.  I

23  reached out to the Department of Justice, spoke with their

24  public-information office.  I think I spoke with a few

25  people on Judge Moody's side, somebody who provided some

1  information.

2      I'm trying -- you know, just -- there's a lot of

3  sources that I interviewed.

4  Q    Okay.  As a result of your interview, you've indicated

5  that you interviewed Miss Wright; is that correct?

6  A    Correct.

7  Q    Okay.  And did you also interview other jurors?

8  A    Correct.

9  Q    And as a result of these interviews, did you write any

10 articles?

11 A    I did.

12 Q    Okay.  And I'm going to show you --

13     If I may approach the witness, Your Honor, I want to

14 show him some articles.

15         THE COURT:  All right.

16 BY MR. LUMUMBA:

17 Q    (Handing item to the witness.)  I ask you to see if you

18 can identify those items that I just shared with you.

19 A    Yes.  These are articles that I had written.

20 Q    Okay.  And does any of them reflect the interview with

21 Miss Wright?

22 A    Yes.  Two of them do.

23 Q    Okay.  And does your -- did you have anything that

24 assisted you in your interview to help you recall, prior to

25 writing your article, what Miss Wright had actually told

1  you?

2  A     Yeah.  I recorded the interviews.

3  Q     Okay.  You recorded the interviews?

4  A     Correct.

5  Q     So, did you have tapes or --

6  A     Digital recordings.

7  Q     And does the -- have you had an opportunity to listen

8  to the tapes subsequent to that to see if it -- and compare

9  it to the article that you wrote?

10  A     Yes.

11         MR. LUMUMBA:  Your Honor, may I have the large

12  marker, please?

13         THE COURT:  You can hand them to Sara and she'll

14  mark them.

15         MR. LUMUMBA:  Hand them to the prosecutor first?

16         THE COURT:  Do you want so see them,

17  Mr. Preston -- the newspaper articles?

18         MR. PRESTON:  I believe I've seen the articles,

19  Judge.

20         THE COURT:  All right.  You can hand them to Sara.

21         You want them marked as Defendant's Composite

22  Exhibit 1?  Do you want them marked as Defendant's Composite

23  1?

24         MR. LUMUMBA:  That will be fine.

25         THE COURT:  All right.

1       MR. LUMUMBA:  Thank you.

2       (Defendant's Composite Exhibit 1 was marked for

3   identification.)

4       MR. LUMUMBA:  Are we ready?

5       THE COURT:  I'm waiting for you.

6       MR. LUMUMBA:  Okay.  I'm sorry, Judge.

7   BY MR. LUMUMBA:

8   Q    Okay.  I'm showing you Defendant's Composite Government

9   Exhibit Number 1 and ask you if you can identify those

10  (handing item to the witness) articles; and tell us,

11  generally speaking, what does each one of the articles speak

12  to?

13      And you can use the title of the article in order to

14  designate which one you're looking at.

15  A    Okay.  The article that says "Buju Banton, Five More

16  Years in Jail?" question mark, is based on three interviews

17  that I had conducted with jurors, not including Mrs. Wright.

18  Q    Okay.

19  A    And that -- that article kind of raised concerns from

20  the jurors' interviews that --

21      MR. PRESTON:  Objection, relevancy.

22      THE COURT:  Sustained.

23  BY MR. LUMUMBA:

24  Q    You can pass on that.

25      Go ahead.  The next article.  What's the next article?

```
 1  A    The next article, going chronologically, was "Another
 2  Juror Says Buju Banton is Not Guilty of Gun Charge."
 3              MR. PRESTON:  Objection, relevancy.
 4  BY MR. LUMUMBA:
 5  Q    And who does that --
 6              THE COURT:  Sustained.
 7  BY MR. LUMUMBA:
 8  Q    Could I ask you, who was the subject of that article?
 9  A    The subject of that article is Terri Wright.
10  Q    Terri Wright?
11  A    Yes.
12              MR. LUMUMBA:  Your Honor, let me say this:  That
13  our initial motion, of course, covered the issue of
14  confusion around the instruction dealing with the gun count,
15  and the jurors were confused and expressed that to -- to the
16  reporter.
17              Now, we asked for an opportunity to subpoena those
18  jurors who have said that, and those jurors included
19  Miss Wright.  Those jurors have not been subpoenaed, but
20  it's our position that it's still relevant to the motion
21  either one or two ways.
22              One, would be for the court to take information on
23  it and see if it wants to grant a mistrial on the basis of
24  that, along with the Miss Wright thing.  We're certainly
25  going to cover Miss Wright.  That's not something we're
```

1   going to leave out here for sure.  I'm just trying to do

2   things chronologically.

3          And, secondly, even if the court felt at this

4   point that that was not a compelling issue, it would help us

5   make a record that could assist if any further proceedings

6   need to be made beyond this court.

7          THE COURT:  Well, the court has already ruled that

8   that's not a compelling issue.  The court is not going to

9   inquire into the thought processes of the jurors except as

10  to whether or not they were influenced by outside

11  information.

12         MR. LUMUMBA:  Okay.

13  BY MR. LUMUMBA:

14  Q    Did you do an article where you spoke to the question

15  of a juror who may have done some improper research during

16  the course of the trial?

17  A    Yes.  That article is called "Buju Banton Juror May

18  Have Violated Court Orders, Grounds for a Mistrial?"

19  question mark.

20  Q    Okay.  And prior to completing that article, did you

21  have an opportunity to listen to your tape and see what you

22  actually discussed with that juror in the tape?

23  A    I did.

24  Q    Okay.  And I'm going to show you a copy of an item here

25  and see if you had a chance to recognize that, if you've had

1   a chance to listen to that; and does that reflect the

2   tape-recorded interview you had with Miss Wright?

3   A    I believe so.

4        MR. LUMUMBA:  Okay.  I would like to move

5   admission of this exhibit, Your Honor.

6        THE COURT:  You want to just admit it for the

7   purposes of the record, or do you plan on playing it?

8        MR. LUMUMBA:  I intend to play portions of it.

9        THE COURT:  Well, are you -- are you proposing to

10  the court that that tape has information that the witness

11  hasn't already told us about?

12       MR. LUMUMBA:  I am proposing to the court that

13  since the court chose to call this witness before

14  Miss Wright, there may be some information needed to impeach

15  Miss Wright, which this witness needs to authenticate.  And

16  so, now I could wait and recall this witness; or if

17  Miss Wright -- if it's necessary, or I can proceed to

18  authenticate the information now.

19       You understand my point?

20       THE COURT:  No, because my question to you was, is

21  there any information that this witness has not told us

22  about that's on the tape?  If there is, let's ask the

23  witness, and let's get the information.  That's why I called

24  him first.

25       MR. LUMUMBA:  All right.

THE COURT:  If there's not, then in the interest
of time, let's don't play the recording.  I'll allow you to
put it in evidence and put it in the record to establish a
record, but no need to play the recording if it doesn't tell
us anything that he hasn't already told us.

MR. LUMUMBA:  All right.

BY MR. LUMUMBA:

Q   Did you specifically put to Miss Wright the question as
to whether or not her research was done during the course of
the trial or whether her research was done after the trial?

A   I did (nodding head).

Q   Okay.  And did you record her specific response?

A   I did.

Q   Okay.  And what was that specific response?

A   I don't know verbatim, but essentially she said that,
"Yes, while the information was still fresh in my head, I'd
go to my car, write the information down, and go home and do
the research."

Q   Okay.  And then did she actually refer after that to
saying that afterwards she did additional research, meaning
after the trial?

A   She did (nodding head).

Q   Okay.  So, she responded to that question with, first,
a response of what she would do when the information was
fresh in her head; is that correct?

1  A    Correct.

2  Q    Then she amended that by saying that afterwards she did

3  additional information on Buju Banton; is that correct?

4  A    Yes.

5  Q    Okay.  Now, let me ask you this:  Did you ask

6  Miss Wright -- did it come up in your interview of

7  Miss Wright how many times she had served on a jury before?

8  A    I did.

9  Q    And how many times?

10 A    I believe she said seven different juries.

11 Q    Okay.  And have you had an opportunity to review her

12 transcript in this matter during her voir dire?

13 A    I have.

14 Q    Okay.  And at any point during that transcript, did she

15 reveal that she served on seven different juries?

16 A    No.

17 Q    Okay.  Do you recall what she did say when the question

18 was put to her?

19 A    I believe she said she served on one jury and that it

20 was a civil case, and I don't recall if she said there was a

21 docket verdict.

22 Q    Did she share with you that she loved -- that she loved

23 and had a passion for serving on juries?

24 A    She did.

25 Q    Right.  Did you have an opportunity to interview the

1 defense counsel in this case, who was the defense counsel at

2 trial?

3 A    David Markus?

4 Q    Yes.

5 A    I did.

6 Q    Did he have any response as to what he would have done

7 had he known she had served on seven different juries?

8         MR. PRESTON:  Objection, relevancy.

9         THE COURT:  Overruled.

10 BY MR. LUMUMBA:

11 Q    Go ahead.

12 A    Yes.  He said he would have struck her.

13 Q    At the time that Miss -- you were talking to

14 Miss Wright, did she give you any indication as to whether

15 or not she had any notes from the trial in her possession

16 still then?

17 A    She did.

18 Q    Okay.  Now, was that during the trial that you talked

19 to her or after the trial?

20 A    This was after the trial.

21 Q    Good.  Do you recall whenabouts you authored these

22 articles?

23 A    Uh, October -- yeah, it had to be October.

24 Q    Okay.  And how long before you authored the article did

25 you actually talk to Miss Wright?

1   A    Well, I published the article, "Buju Banton, Five More

2   Years in Jail?" question mark, on October 11th, and then I

3   interviewed Miss Wright a few days afterwards.

4   Q    And did you publish the article concerning the "May

5   Have Violated Court Orders" shortly after you published

6   that -- published the other?

7   A    I did.

8   Q    Okay.  And so, at the time that you were talking to

9   her, this would have been in 2012; is that correct?

10  A    Correct.

11  Q    Okay.  And she still had -- did she still have notes at

12  that time?

13  A    She did.

14  Q    What gave you the impression that she still had notes?

15  A    She said, "Let me look through my notes," and then I

16  believe she asked someone else in the room to hand over a

17  box of notes.

18       She had mentioned -- she was looking for information on

19  *Pinkerton*, and I could kind of hear her rifling through what

20  sounded like a box of notes.  Then she offered to call me

21  back later and provide, you know, further information on

22  *Pinkerton*, because I was a bit confused as to what that was.

23  Q    Were you aware -- did you sit through the trial even

24  during the course of the time that the judge was voir-diring

25  jurors and counsel were voir-diring jurors?

A     Yes.

Q     Okay.  Were you there at the time when the judge gave the instructions that if notes were to be taken, they were to be left in the courtroom?

A     I was there for -- I don't recall that specific instruction, but I'm assuming I was there for all the instructions and everything except for the day when the verdict was delivered.

Q     So, if that instruction appears on page 93 of the transcript, you don't remember for sure?

A     I don't remember for sure.

Q     Okay.

      Did you ask Miss Wright if there was a substantial difference in the jurors' -- well, strike that.

      Did she ever make an indication to you how the jurors during the beginning of the deliberations -- what the breakdown was in terms of guilty/not guilty?

            MR. PRESTON:  Objection, relevancy.

            THE COURT:  Sustained.

BY MR. LUMUMBA:

Q     Okay.  Did she ever make any indication to you whether there was a dramatic change and when it took place?

            THE COURT:  Sustained.

            MR. PRESTON:  Objection, relevancy.

            MR. LUMUMBA:  Judge, I'd take it subject to tying

1  it up.

2         THE COURT:  Not until I see some relevance.  We're

3  not going to get into the thought processes of the jurors.

4  BY MR. LUMUMBA:

5  Q    Just a couple other questions, Mr. Sweeney.

6      When Miss Wright was speaking to you about her prior

7  jury service, did she indicate that she was passionate about

8  serving on the jury?

9  A    She did.

10 Q    Okay.  And did she indicate that she had served on a

11 previous juror -- jury, the one previous to this one where

12 she had only been an alternate?

13 A    She did.

14 Q    Did she express how disappointing it was that she could

15 not participate?

16 A    She did.

17 Q    Did she ever complain to you why she never revealed

18 that she had served on seven juries?

19 A    She did not.

20        MR. LUMUMBA:  No other questions for the witness

21 at this moment -- at this time.

22        THE COURT:  All right, Mr. Preston, you have any

23 questions?

24        MR. PRESTON:  Just briefly, Your Honor.

25                   *CROSS-EXAMINATION*

BY MR. PRESTON:

Q    Good morning, Mr. Sweeney.

A    Good morning.

Q    You and I have haven't spoken before?

A    Correct.

Q    Mr. Sweeney, just to clarify, Miss Wright indicated that any research that she did have had no influence on her verdict; correct?

A    I believe she -- her phrasing was she didn't think it had any influence on it.

Q    All right.  By the way, how was it that you were able to track Miss Wright down for this interview?

A    I attended the entire trial, so -- I was here for voir dire, and then I used a search engine called "ZabaSearch," which kind of compiles public records.

Q    Can you spell that for the court reporter?

A    Yes.  It's Z-A-B-A-S-E-A-R-C-H.com.

Q    That interview took place after your first article talking about the gun count; correct?

A    Correct.

        MR. PRESTON:  Thank you.

        Nothing further, Judge.

        THE COURT:  Thank you, sir.  You may step down.

        MR. LUMUMBA:  May I --

        THE COURT:  All right.

1    MR. LUMUMBA:  -- ask another question?

2              *REDIRECT EXAMINATION*

3   BY MR. LUMUMBA:

4   Q    To be a little more precise about what Miss Wright told

5   you, she indicated to you that she was aware that she wasn't

6   supposed to be doing research during the course of the

7   trial; is that correct?

8   A    She did.  She said something to the extent of -- I

9   think she did.  She said that she tried to follow the rules

10  as best she could, and then she laughed a bit and said, "I

11  don't think what I found out would have changed," or

12  something like that.

13  Q    What she said is, "I don't think what I found out would

14  have changed my mind much"; is that correct?

15  A    Yeah.  I don't recall the exact phrasing, but that

16  was --

17  Q    In other words, she didn't say absolutely it had no

18  effect on her?  She said she didn't think what she found out

19  would have changed her mind much, or something to that

20  effect?

21  A    Something to that effect.

22  Q    And she also said that -- she also recognized, was the

23  question, that she had been instructed not to listen or to

24  do research during the course of the trial?

25  A    Correct.  She said, "You know, I tried to follow that";

1   and then as I stated, she laughed.

2   Q    Okay.  In fact, you do quote her in your article when

3   you say, "'They give you instructions not to go online and,

4   you know, make an opinion.  I tried to follow that as close

5   as possible,' Wright says, followed by a laugh"; is that

6   correct?

7   A    That's correct.

8   Q    And then she said, "I don't think that what I found out

9   would have changed how I thought."  Is that what she said?

10  A    Correct.

11  Q    All right.  Then finally -- my final question to you:

12  During the course of the interview, did there come a time

13  that she appeared to be looking through a large quantity of

14  things or boxes or things?

15          THE COURT:  You can't say it here.  He already

16  said he heard papers rustling and he assumed she was looking

17  into a box of papers.

18  BY MR. LUMUMBA:

19  Q    What led you to conclude that she had research there?

20  A    I think she said something to the extent of like, "Let

21  me get my files for that case," and then there was some type

22  of rustling, and then there was a long pause.

23          MR. LUMUMBA:  All right.  Thank you.

24          THE COURT:  Thank you, sir.  You may step down.

25  Would you wait in one of the witness rooms outside the

1  hallway doors, please.

2          THE WITNESS:  Wait out there?

3          THE COURT:  Wait out there in one of the witness

4  rooms or the hallway.

5          Would you bring in Miss Wright, please.

6          (The witness was duly sworn or affirmed and

7  responded as follows:)

8          THE WITNESS:  Yes, I do (seated).

9          THE CLERK:  Please state your name and spell your

10  first and last name for the record.

11          THE WITNESS:  Terri Monique Wright, T-E-R-R-I

12  W-R-I-G-H-T.

13          THE CLERK:  Thank you.

14                          **TERRI WRIGHT,**

15  the witness, being sworn or affirmed, testified as follows:

16          THE COURT:  Miss Wright, do you know why you're

17  here?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  When I sent you a notice to be here,

20  did you notice the language on there that you had the right

21  to have an attorney?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Some of the items or issues we will be

24  exploring might impact whether or not you violated a court

25  instruction.

1              Do you wish to have a lawyer?

2              THE WITNESS:  No.

3              THE COURT:  It's come to the court's attention

4    that you spoke to a reporter and told the reporter that, in

5    spite of my instruction not to do any research during this

6    trial, that when you went home, you did some research.  Is

7    that right?

8              THE WITNESS:  I did the research after the trial.

9              THE COURT:  All right.  Tell me how you did that.

10             THE WITNESS:  I'm sorry.  I don't understand your

11   question.

12             THE COURT:  Well, how would you know what to

13   research after the trial?

14             THE WITNESS:  After the verdict was given, the

15   trial was over, is what I researched.

16             THE COURT:  What did you research?

17             THE WITNESS:  Information just about Mr. Myrie and

18   his music -- because I didn't know anything about him and

19   the music -- and this *Pinkerton* law.

20             THE COURT:  All right.  What research, if any, did

21   you do while the trial was going on?

22             THE WITNESS:  I didn't do any research during the

23   trial.

24             THE COURT:  Did you make notes of things that

25   occurred during the trial?

1          THE WITNESS:  What I wanted to research after the

2   trial, which was those two items.

3          THE COURT:  So, you made notes while the trial was

4   going on, but you didn't do any research follow-up on those

5   notes until after the trial was over?

6          THE WITNESS:  Exactly.

7          THE COURT:  Do you still have the notes?

8          THE WITNESS:  No, sir.

9          THE COURT:  What happened to the notes?

10         THE WITNESS:  Actually, they weren't even notes.

11  My first one was on a piece of paper about the *Pinkerton Act*

12  and then to look up Mr. Myrie's music.

13         THE COURT:  Did you have any discussions with

14  other jurors about these issues other than the verdict

15  itself?

16         THE WITNESS:  No.

17         THE COURT:  Did you discuss with them the fact

18  that you were doing research or were going to do research?

19         THE DEFENDANT:  No, sir, because my research was

20  after the trial was over.

21         THE COURT:  All right.

22         Does defense counsel have any questions?

23         MR. LUMUMBA:  Yes, Judge.  I have a few.

24                   *DIRECT EXAMINATION*

25  BY MR. LUMUMBA:

1   Q    Good morning, Miss Wright.

2   A    Good morning.

3   Q    Miss Wright, at a -- you had this interview with

4   Mr. Sweeney.  That interview would have occurred sometime in

5   October of 2012; is that correct, if you can recall?

6   A    Yes.

7   Q    And if -- at the time that he interviewed you, he, of

8   course, spoke to you, and you spoke to him; is that correct?

9   A    Yes.

10  Q    Okay.  If you were to hear a recording of yourself

11  talking to him, you, of course, would recognize it; is that

12  correct?

13  A    Yes.

14        MR. LUMUMBA:  We're trying to locate an area,

15  Judge, on the tape.

16        (Pause.)

17  BY MR. LUMUMBA:

18  Q    While we're waiting for him to locate that, let me

19  share this with you, and you can share it with the judge.

20  During the course of the voir dire at the beginning of the

21  trial, you were asked -- the judge asked you to read from

22  your questionnaire into -- and to answer several questions

23  which appeared there on the questionnaire; is that correct?

24  A    Yeah.

25  Q    Okay.  And one of the things that appeared on the

1  questionnaire was a question about had you served on juries

2  before; is that correct?

3  A    Yeah.

4  Q    And you didn't tell the judge that you had served on

5  seven different juries, did you?

6  A    I don't think that was the question of how many.

7  Q    Well, what you told the judge is, "I have served in

8  previous juries, and it was a civil case, and there was a

9  verdict"; is that correct?

10 A    Yeah.

11 Q    So, you didn't bother to break down the fact that you

12 had served on more than one jury?

13 A    No.

14 Q    And had you -- the seven different juries, it is, in

15 fact, true, that you shared with Mr. Sweeney that you had

16 served on at least seven juries before; is that correct?

17 A    Yeah.

18 Q    And during the course of those jury trials, some of

19 them were criminal cases, and some of them were civil cases,

20 is that correct?  Or you tell me.

21 A    I think they were both.

22 Q    So, you had some civil and some criminal?

23 A    Uh-huh (nodding head).

24 Q    Okay.  And you seemed to, when you were talking to

25 Mr. Sweeney, remember your service pretty well; right?

```
1   A      Yeah.

2   Q      In fact, you said you were passionate about it; right?

3   A      Right.

4   Q      You said, if you could, you'd do this for a profession,

5   you'd do this all the time?

6   A      Yes.

7   Q      Now, did it occur to you that you should explain to the

8   judge during the course of his questioning that you had

9   served on more than one jury trial, that you had served on

10  many jury trials?

11  A      Should I have explained that?

12  Q      Yeah.  Did that occur to you?

13  A      No, because that wasn't a question.

14  Q      I see.

15         Well, during the course of the trial, you did hear

16  other jurors break down their jury service when they talked

17  about more than one service; is that correct?  And if you

18  don't recall --

19  A      I don't recall.

20  Q      Let's see if I can help you.

21              MR. LUMUMBA:  May I approach the witness?

22              THE COURT:  Yes.

23  BY MR. LUMUMBA:

24  Q      I'm drawing your attention here to -- you were asked

25  this question on page 12 of this transcript (handing item to
```

1  the witness).  Would that be correct that you answered the

2  question by saying, "My name is Terri Wright"?

3  A    Yes.

4  Q    And you went on to say that, "I have served on previous

5  juries, and it was a civil case, and there was a verdict."

6  Correct?

7  A    Right.

8  Q    That's all you said as far as that question is

9  concerned?

10  A    Yes.

11  Q    Then just a few pages after that on page 22, a

12  gentleman apparently by the name of "Billy Hall" spoke; is

13  that correct?

14  A    I'm assuming.

15  Q    Well, that's what it says here?

16  A    Well, he spoke.

17  Q    Says that -- he gets down to the question -- he says

18  the civil -- he says that, "My name is Billy Hall.  I've

19  lived in Plant City 26 years.  I've lived in Florida all my

20  life.  I am a manager of Publix.  I am married.  My wife is

21  self-employed.  I have two sons," and he goes on to say,

22  "One is 17, and one is 20.  I have not served in the

23  military, and I have served on a civil and a criminal case.

24  The civil was a 'no' verdict, and the criminal case was a

25  verdict."  Correct?

1    A    Uh-huh.

2    Q    At the time that he explained that, did that move you

3    to ask the judge if you could explain that you had actually

4    served on more than one trial?

5    A    No.

6    Q    Actually, even during the course of this voir dire, you

7    were called on again, were you not?  On page 44 of this

8    transcript, I think the counsel opposite over there, the

9    prosecutor, Mr. Preston, asked you a question about race.

10   Do you remember that question?

11   A    Vaguely.

12   Q    Okay.  He went on to say that -- he said, "Miss Wright,

13   I will have to take this one step further, please.  Excuse

14   me.  You are an African-American; correct, ma'am?"

15        And you said, "Yeah"; is that correct?

16   A    Yeah.

17   Q    And then he says, "And the defendant is black, the

18   gentleman on trial."  Is that correct?

19        And you said "Yes"?

20   A    Yes.

21   Q    Then he went on to explain that you didn't accept the

22   rule that just because you were black you were supposed to

23   find a black person not guilty, and you agreed with him?

24   A    Right.

25   Q    Okay.  Did you take the opportunity at that time to

1  explain to the judge or ask anybody if you could explain to

2  them that actually you wanted to expand on your answer about

3  having been on jury service?

4  A    No.

5  Q    You did share with Mr. Sweeney when you talked to him

6  that the trial just previous to the one that you served on

7  in this case -- that that was a malpractice trial; is that

8  correct?

9  A    Yes.

10 Q    And that actually, to your disappointment, as you

11 pointed out, you found out that you were an alternate; is

12 that right?

13 A    Yeah.

14 Q    You didn't have a chance to participate in the

15 decision?

16 A    Right.

17 Q    And that ran counter to your passion to be involved in

18 these jury trials; is that right?

19 A    Yeah.

20 Q    And it would be safe to say that you were kind of

21 guarded about what you said about your previous service is

22 because of your passion and you wanted to make sure that you

23 had an opportunity to serve on this trial; is that correct?

24 A    I would say no, because it wasn't a question of how

25 many trials or juries that I had served on.

```
1   Q    Mm-hmm, all right.  So, you could have said more than
2   one, if you wanted to?
3   A    I could have, yes.
4   Q    I see.  And you see that there were other people who
5   did say more than one when they were asked the question;
6   right?
7   A    Yeah.
8   Q    And so, even though you say that you weren't asked a
9   question -- or the way the question was put to you didn't
10  ask for more than one, you realized you could say more than
11  one, if you wanted to?
12  A    Yeah.
13  Q    But you decided not to do that?
14  A    At the time I answered the question, I didn't think
15  about how many trials I was on at the time previously.
16  Q    Let's answer my question first; and then if you need to
17  explain, I will and the judge will certainly allow you to
18  explain, but let's just answer the question first.
19       THE COURT:  She's already answered the question
20  three times.
21  BY MR. LUMUMBA:
22  Q    All right.  Well, the question -- because most of my
23  questions can be answered "yes" or "no."  Did you decide not
24  to say what the other trials were?
25  A    No, I did not.
```

```
 1          MR. LUMUMBA:  We need to find the spot on the
 2   tape, Your Honor, if we can.
 3          (Pause.)
 4   BY MR. LUMUMBA:
 5   Q    You were aware that during the course of the trial, on
 6   various different occasions the judge gave you instructions
 7   on not doing research during the course of the trial; is
 8   that correct?
 9   A    Yeah.
10          THE COURT:  The recording is not in evidence.  Are
11   you now offering it into evidence?
12          MR. LUMUMBA:  Oh, yes, Your Honor.  I would like
13   to offer it in evidence.
14          THE COURT:  As Defendant's Exhibit 2?
15          MR. LUMUMBA:  Yes.
16          THE COURT:  All right.  It will be admitted.
17          (Defendant's Exhibit 2 was received in evidence.)
18          THE COURT:  Sherry, if you can, take down what's
19   said on the recording.
20   BY MR. LUMUMBA:
21   Q    While we're waiting, we can proceed with these
22   questions on -- were you not at some point by the judge --
23   and this is reflected on page 91 and 92 of the transcript --
24   instructed that, "Finally, our law requires that you not
25   read or listen to any news accounts of the case and that you
```

1    not accept" -- excuse me, "attempt to research any fact,

2    issue, or law related to the case.  Your decision must be

3    based solely on the testimony and evidence presented in this

4    court"?  Is that what it said?  Do you recall that

5    instruction?

6    A    Yeah.

7    Q    And it goes on to say, "That also the law uses words

8    and phases in special ways, so it's important that any

9    definitions that you hear come only from me and not from

10   other sources."  Is that correct?

11   A    Yeah.

12   Q    "It wouldn't be fair to the parties for you to base

13   your decision on some reporter's view or opinion or upon

14   other information you require" -- "or you acquire," I'm

15   sorry, "outside the courtroom"; is that correct?

16   A    Yes.

17   Q    And you remember him telling you, "These rules are

18   designed to help guarantee a fair trial, and our law

19   accordingly sets forth serious consequences if these rules

20   are not followed"?  You recall that?

21   A    Yes.

22            MR. LUMUMBA:  For the purpose of the record, we're

23   going to go to what is reflected as 31 minutes on the tape.

24   Okay?

25            (Tape played as follows:)

```
 1          "UNIDENTIFIED MALE:  I'll be here incorporating.
 2   It's difficult to follow what your impressions of that.
 3          "UNIDENTIFIED FEMALE:  I don't think --
 4   (inaudible)."
 5          MR. LUMUMBA:  Can you hear the tape now?
 6          (Tape played as follows:)
 7          "UNIDENTIFIED MALE:  Did you do the research as
 8   you -- that is your thing.  Did you go home and do research
 9   and see what it does then (inaudible) saying everything
10   was -- I'm just fascinated by that.  Do you do it, you know,
11   while it's going on and getting informed and then follow up
12   with it?
13          "UNIDENTIFIED FEMALE:  Right.  Right.
14   (Inaudible.)  I had a lot of law, and I had stuff going on
15   in my mind.  You know, they're going to give you
16   instructions not to go online; and, you know -- I mean,
17   they're not kidding there.  I typed all that (inaudible),
18   but I don't think I would give what I found out, saying how
19   I thought, you know, what I (inaudible) but I wouldn't.
20   That's why I would sit in my car and write the notes, so I
21   could remember it; and I would come home and do the
22   research.  And then after the trial, I would go and I did
23   the research on -- typed in information on other trials
24   or -- you know, and there was that thing with the law, and I
25   also (inaudible) there is a hand jury out there, and I went
```

1  on to find cases, and I can see if I go online (inaudible).

2  I seen that three different lawyers participated in it

3  (inaudible) up again.  So, you know, that would have kind of

4  (inaudible) that (inaudible) explain this law to me and --

5          "UNIDENTIFIED MALE:  What does this mean exactly?

6  It's hard to like, you know -- was it tough?"

7          (The playing of the videotape was concluded.)

8  BY MR. LUMUMBA:

9  Q    Now, let me ask you some specific questions about what

10  I thought I heard, because I want you to straighten this out

11  if I heard it wrong.

12      First of all, the question was clearly put to you -- he

13  said something like he found this interesting or whatever,

14  and he said, "I'd just like to know, do you do the research

15  during the course of the trial, or do you wait until after

16  the trial?"  He specifically asked you that question, didn't

17  he?

18  A    Yes.

19  Q    And you didn't respond by saying, "I wait till after

20  the trial"?  You didn't say that, did you?

21  A    No.

22  Q    In fact, what you said is that, "I write down my notes

23  while they're fresh in my mind"; correct?

24  A    Yes.

25  Q    "And then I go home and do the research."  That's what

1  you said; right?

2  A    That's what I said.

3  Q    You didn't say, "I went home and did the research at

4  one point after the trial."  You said, "I go home and do the

5  research"?  That's what you said; right?

6  A    Yes.

7  Q    And, in fact, then at a certain point, you're saying,

8  "Then after the trial, I actually did research on Buju

9  Banton's" -- something specific about Buju Banton, about

10 his -- well, let's listen to it again, because even I forget

11 some things.

12       Go ahead and play it over again.

13       (Tape played as follows:)

14           "UNIDENTIFIED FEMALE:  (Inaudible.)  If you'll

15 call back tomorrow, I will get the -- or call back tomorrow,

16 and I want to look at how it applied, because it's painful.

17 Under the law, you know, things that -- the law that I

18 didn't have a hundred percent with -- (inaudible) so, you

19 know, (unintelligible) here.

20           "UNIDENTIFIED MALE:  Do you do the research

21 as you're -- like do you go home and do research then, or do

22 you wait till after everything is over?  I'm just fascinated

23 by that.  You know, do you do research after the trial, or

24 do you do it, you know, while the trial is going on and then

25 follow up with it?

1    "UNIDENTIFIED FEMALE:  Right.  (Inaudible) I had a

2    ton of law and a lot of tough pressure in my mind.  You

3    know, at the beginning they instruct you not to go online

4    and, you know, to make an opinion.  (Inaudible) but I don't

5    think, you know -- black spelled out what -- how I thought,

6    you know, what I (inaudible) what the evidence is.  That's

7    not fair."

8              (The playing of the tape was concluded.)

9    BY MR. LUMUMBA:

10   Q    Now, what you say -- he asks you a very specific

11   question.  "Do you do the research during the trial -- I'm

12   fascinated by this -- or do you do the research after the

13   trial?"  Is that correct?

14   A    Yeah.

15   Q    And you don't respond, like we said before, by saying,

16   "I do the research after the trial."  You say, "I do it

17   while it's fresh in my head."  That's what you said on the

18   tape; right?

19   A    That's what I said.

20   Q    Okay.  And you go on to indicate that they tell you not

21   to research or something like that?

22   A    Yeah.

23   Q    But -- and then you kind of laughed.  You kind of

24   laughed, or did you pick that up?

25   A    I might have, yeah.

1  Q    And then you say, "I don't think what I found out would

2  have would affected me that much."  That's what you said;

3  right?

4  A    Yes.

5  Q    You didn't say, "I don't think that" -- first of all,

6  you didn't say, "I didn't find out anything."  You said

7  that, "I don't think that what I found out would have

8  affected me that much."  That's what you said; right?

9  A    Yes.

10  Q    Okay, that's what I thought.  Let me play the rest of

11  it.

12        (Tape played as follows:)

13            "UNIDENTIFIED FEMALE:  I went to the car; and when

14  I get in the car, I marked my notes so I could remember, and

15  I would come home and it will be clear in your head.  You

16  know, after the trial, I would go and do the research on

17  finding information on the trial."

18  BY MR. LUMUMBA:

19  Q    Now, in fact, you even get a little more specific.  You

20  said that you would go to your car while it was still fresh

21  in your mind; and, of course, you went to your car every day

22  after the case; is that right?

23  A    Yes.

24  Q    Then you said you would go to your car and write it

25  down while it's still fresh in your mind; right?

1   A    Yeah.

2   Q    Okay.  And did it occur to you that the court had

3   already given you instructions about notes at trial?

4   A    Yeah.

5   Q    Okay.  And on page 93 of the transcript, the court

6   says -- one of the things -- the last thing it said before

7   it let the jury go after it selected the jury, "Do not let

8   note taking distract you so you do not hear other answers by

9   witnesses.  When you leave the courtroom, your notes should

10  be left in the jury room"; is that correct?

11  A    Yeah.

12  Q    And, of course, if you leave your notes in the jury

13  room, that might facilitate to make sure the jurors don't do

14  research at home on the case; right?

15  A    Right.

16  Q    Okay.  But what you're telling us on that tape is that

17  you actually did write notes down in your car, and you went

18  home and you researched?  That's what the tape says; right?

19  Isn't that what it says?

20  A    Right.  Like I explained to the judge, I wrote two

21  things down, and I did my research after the trial.

22  Q    That's not what it says on the tape.  You didn't say on

23  the tape, "I did my research after the trial"?  You didn't

24  say that, did you?

25  A    No.

1  Q    In fact, you made it clear on the tape that what you

2  did after the trial is you researched his retrial -- or his

3  first trial -- excuse me, not retrial, but the first trial,

4  because you distinctly said that?  "After the trial, I

5  researched his first trial"?  Isn't that what you said on

6  the tape?

7  A    Yes.

8  Q    So, you separated those two.  You talked about what you

9  did when stuff was fresh in your head; and as far as the

10 fresh-in-your-head stuff, you said you wrote it down in the

11 car; right?

12 A    Yes.

13 Q    And then you went home and did research?

14 A    After the trial, yes.

15 Q    It doesn't say after the trial, does it?

16 A    No, but it was after the trial.

17 Q    Well, that's not my question.  That's why you need to

18 answer --

19         MR. PRESTON:  Objection.  She answered the

20 question no and then explained it.

21         THE COURT:  Move on, please.

22 BY MR. LUMUMBA:

23 Q    On the tape, the only thing you said that you

24 researched after the trial was his retrial; right?  That's

25 what you say on the tape; right?

```
 1   A    I did all my research --

 2   Q    No, no, no.

 3   A    Well, to answer your question, yes.  If it's on the

 4   tape, yes.

 5   Q    The only thing that you say on the tape is that you

 6   researched his first trial, right, after the trial?  Is that

 7   right?  Is that what you say on the tape?

 8   A    Yes.

 9   Q    And the man made it very clear for you in his question

10   what he was asking you; right?

11   A    Yes.

12   Q    It wasn't like it was a sneaky question or a difficult

13   question to understand?

14   A    No.

15        MR. LUMUMBA:  Now, can we go to -- on the tape --

16   let's try 22, which, for the record, is 22 minutes.

17   (Tape played as follows:)

18        "UNIDENTIFIED MALE:  I think that's pretty gross,

19   yeah.  Let's talk about" --

20        MR. LUMUMBA:  Judge, I'm changing it because I

21   think this part -- okay.  Go back to -- not 22 minutes, but

22   1900 or 19 minutes.

23        (The tape was played as follows:)

24        "UNIDENTIFIED MALE:  If you wanted to, you know,

25   learn about him, if you wanted to know what happened to him,
```

1   why he wasn't in the courtroom?

2           "UNIDENTIFIED FEMALE:  Yeah.  I think that had to

3   end up doing with it on -- the other side was present or if

4   they weren't able to say, 'Okay, this was all me.  Buju

5   Banton had nothing to do with it to me.'  (Inaudible.)  To

6   me it would either change it or, you know, had another hung

7   jury.  But once that's identified --

8           "UNIDENTIFIED MALE:  What about -- I don't know

9   what -- I am surprised that you remember -- like I said,

10  that you remember that, the *Pinkerton Rule*.  Did that have

11  anything to do with any -- I mean, did you guys talk about

12  entrapment?  You wondered about entrapment?

13          "UNIDENTIFIED FEMALE:  Uh, yes, that was -- I was

14  wondering (inaudible)."

15          MR. PRESTON:  Objection, Judge.  There's no

16  question proposed of this witness as a basis for playing any

17  recording at this point.

18          MR. LUMUMBA:  Well, what the question is --

19          THE COURT:  Overruled.

20          MR. LUMUMBA:  Overruled, Your Honor?

21          THE COURT:  (Nods head.)

22          (Tape played as follows:)

23          "UNIDENTIFIED MALE:  (Inaudible.)"

24          MR. LUMUMBA:  You need to stop that.  We're going

25  to move back just a little.

BY MR. LUMUMBA:

Q    You remember when he asked you a question and you
started looking for a file; is that correct -- or looking
for notes?  Do you recall that?

A    Right.

Q    And that was around the discussion around the *Pinkerton
Rule*; right?

A    Right.

Q    Okay.  And so, that's what you're doing there on the
tape, is you're looking actually for notes; right?

A    Right.

Q    And you said to somebody who was not on the tape, "Hand
me that box" or something like that?

A    Uh-huh.

Q    So, you obviously have a file or had a file with
information in it on the case; right?

A    No, not on the case.

Q    Well, he asked you about the *Pinkerton Rule*, and -- he
obviously didn't understand what it was.  That was pretty
clear; right?  Or if you remember.

A    I don't remember.

Q    Okay.  But, anyway, he asked you about it; is that
right?

A    Yeah.

Q    And then you asked somebody else to hand you a box; is

1  that right?

2  A    Right.

3  Q    And you started looking through the box and looking for

4  a file; is that right?

5  A    Papers, yes.

6  Q    Oh, you're looking for notes because you called them

7  "notes" on the tape; is that right?

8  A    Yes.

9  Q    And you apparently never found the notes that you were

10  looking for at that time?

11  A    Right.

12  Q    And you told him you would even get back with him the

13  next day once you found your notes; is that right?

14  A    Right.

15  Q    So, that was the notes on the *Pinkerton*; is that right?

16  A    Right.

17  Q    What else was in that box?  What other kind of papers?

18  Were they other papers related to this trial?

19  A    No.

20  Q    What else was in the box?

21  A    Just other junk papers.  The notes that I took was what

22  I found online.

23       MR. LUMUMBA:  Judge, I don't have any other

24  questions of this witness.

25       THE COURT:  Mr. Preston, you have any questions?

1        MR. PRESTON:  Yes, sir.

2                    *CROSS-EXAMINATION*

3   BY MR. PRESTON:

4   Q    Miss Wright, we just discussed -- or you just discussed

5   with counsel this issue of notes.  When you're speaking to

6   Mr. Sweeney over the phone, did you acquire any notes that

7   you had taken or had printed out in regard to this trial

8   during your conversation with Mr. Sweeney?

9   A    No.

10  Q    So, any attempt to find what you had referred to as

11  your notes was not successful during your conversation with

12  Mr. Sweeney; is that correct?

13  A    That's correct.

14  Q    And the notes that you were referring to, were they

15  notes that you already described to the court, the two

16  things that you wrote down?

17  A    Yes.

18  Q    Did it also include things that you printed out from

19  the Internet during your research of this case?

20  A    No.  I didn't print anything out.

21  Q    You had -- did you print anything out with regard to

22  *Pinkerton*?  I'm not sure what you told counsel in that

23  regard.

24  A    No, I didn't print anything.

25  Q    So, the only notes that we're referring to would be the

1  two notes that you already talked to the court about?

2  A    Yes.

3  Q    Now, I gather from the questioning that there's some

4  confusion as to when you did research in this case; correct?

5          MR. LUMUMBA:  Objection to that.  That's not

6  testimony nor evidence.

7          THE COURT:  Overruled.

8  BY MR. PRESTON:

9  Q    You gathered that; correct?

10  A    Yes.

11  Q    I'm not sure I heard this exactly when I listened to

12  the recording, but the quote in the Internet article in this

13  regard was that, "'I would get in the car, just write my

14  notes down so I would remember, and I would come home and do

15  the notes,' she says," referring to you.  Have you seen that

16  article?

17  A    Yeah -- well, I saw one article.  I don't know if it's

18  that exact one.

19  Q    All right.  And your testimony is that the research

20  that you did was after the trial; correct?

21  A    Yes, sir.

22  Q    What I would like you to do is explain to the jury --

23  the court that inconsistency between "I would come home, do

24  the research," as recorded by Mr. Sweeney, as apparently

25  quoted on this recording, and what you told the court about

1  doing research after the trial.

2  A    My research was done after the trial.  After I read an

3  article that Mr. Sweeney had published, I had sent him a

4  text message, and I had that on my phone when I got the

5  court order, Your Honor, to show you.

6         THE COURT:  All right.

7         THE WITNESS:  I sent him a text message to explain

8  that I didn't -- my research was done after, not during the

9  trial at all.

10  BY MR. PRESTON:

11  Q    You explained that to Mr. Sweeney after this interview?

12  A    Yes, I did.

13  Q    And that was in the text message?

14  A    Yes.

15  Q    And you have that today?

16  A    Yes, sir.

17  Q    In what form do you have that today?

18  A    On my cellphone.

19  Q    Could I see that, please?

20  A    Yeah.

21         MR. PRESTON:  May I approach the witness,

22  Your Honor?

23         THE COURT:  Yes.

24  BY MR. PRESTON:

25  Q    While you're looking for that, other than the time I

1  questioned you during voir dire, we've had no other contact;

2  correct?

3  A    Correct.

4      Okay.  I have it ready.  I'm sure you know you just

5  need to scroll down.

6  Q    And this is from -- on your Motorola cellphone, a text

7  message to Chris Sweeney, reporter, and it starts with, "Hi,

8  Chris.  This is Terri Wright"; correct?

9  A    Yes.

10      MR. PRESTON:  Judge, I don't know how to introduce

11  this as an exhibit.  I know I can publish it on the overhead

12  as we're going through this; but as far as maintaining

13  what's in this text message as a record, I don't have the

14  ability of the court to print this out.

15      THE COURT:  Does defense counsel have any

16  objection to him just reading it into the record and giving

17  the date, if the date shows up on the screen?

18      Without putting the --

19      MR. LUMUMBA:  I don't have -- what's your

20  question, Judge?  I'm sorry.

21      THE COURT:  Rather than put the phone itself into

22  evidence, do you have any objection to him reading what the

23  text message is and the date, if the date appears on the

24  screen?

25      MR. LUMUMBA:  No, I don't.  This -- I may be able

1  to help.

2      THE COURT:  Sara says another alternative is she

3  can take a picture of the screen with her cellphone and

4  then print out the electronic picture.

5      MR. PRESTON:  Well, Your Honor, counsel apparently

6  had a copy of this, and I have a hard copy that he's

7  provided me, so I'm going to ask Miss Wright if she'd come

8  up and authenticate that we're talking about the same thing.

9  With counsel's permission, I will introduce this as a copy

10 of the conversation.

11     THE COURT:  All right.

12 BY MR. PRESTON:

13 Q    Miss Wright, I'd like to show you what I'll identify as

14 Government's Exhibit Number 1 for this hearing and ask you

15 if you can compare this paper printout of a text message

16 with your phone and ask -- tell me if that is a copy of the

17 message which you sent to Mr. Sweeney.

18 A    Yes.

19 Q    Does that contain the message that we're talking about?

20 A    Yes, it does.

21     MR. PRESTON:  I would move Government's Exhibit

22 Number 1 into evidence at this time.

23     THE COURT:  Be admitted.

24     (Government's Exhibit 1 was received in evidence.)

25     THE COURT:  Is there a date?

1          MR. PRESTON:  We're going to get to that,

2  Your Honor.

3  BY MR. PRESTON:

4  Q    (Changes overhead exhibit.)  Now, on this text, it

5  reflects October 26, 2012, 11:21 p.m.; correct?

6  A    Yes.

7  Q    Is that the time that you communicated with

8  Mr. Sweeney?

9  A    That was after.

10  Q    I'm sorry.  Is that the time that you sent Mr. Sweeney

11  this communication?

12  A    I'm sorry, yes.

13  Q    This reads, "Hi, Chris.  This is Terri Wright.  I did a

14  phone interview with you regarding Buju Banton.  Just read a

15  article.  There is a huge misunderstanding with your

16  questions.  I did not violate any of the" -- (changing

17  overhead exhibit) it appears it may be missing something

18  after 'any of the."  Can you check your phone and see if

19  that's the case?

20  A    Yes.  There's a sentence cut off.

21  Q    Could you read what you stated in between, "I did not

22  violate any of the" and "more research"?

23  A    Okay.  "I did not violate any of the judges'

24  instructions with this case."

25  Q    What comes right before "research"?

1  A    Oh, "I did my research AFTER the case was over and the

2  verdict was given."

3  Q    And I'll continue.

4      And "AFTER" is in capital letters -- "the case was over

5  and the verdict was given, not during the case.  I took this

6  very serious, and this needs to be corrected.  It is clear

7  that I misunderstood your question.  I did not understand

8  your phone call" -- "your last phone call to me.  Now it

9  makes sense.

10      "This is not right.  Again, all my research was after

11  the case to get a better understanding of law and charges,

12  not during the process.  I trusted you and now feel totally

13  betrayed."

14      You weren't questioned about this communication by

15  counsel; correct?

16  A    No.  No.

17  Q    Did Mr. Sweeney get back in touch with you to try to

18  find out what this misunderstanding involved?

19  A    No.

20  Q    You can still see how this would appear inconsistent

21  with a statement that, "I would write my notes down in my

22  car, and I would come home and do the research"?

23  A    Yes.

24  Q    And you still state that the research was done after

25  the trial; correct?

```
 1   A    Yes, it was.
 2   Q    And your statement that we listened to today says, "I
 3   don't think what I found out would have changed what I
 4   thought"; correct?
 5   A    Correct.
 6   Q    And that would be a reference to your -- your research
 7   after the trial, not affecting what you determined during
 8   the course of the trial; correct?
 9   A    Correct.
10   Q    If you had done that research during the course of the
11   trial, would it have made any difference in what you
12   determined in your deliberations?
13   A    No.
14           MR. PRESTON:  Nothing further, Your Honor.
15           THE COURT:  Let me ask a question before you ask
16   more questions.
17           Some of the questions you were asked had to do
18   with Pinkerton; right?
19           THE WITNESS:  Yes, sir.
20           THE COURT:  Had you ever hear the word "Pinkerton"
21   before this trial?
22           THE WITNESS:  No.
23           THE COURT:  And during this trial, the only time
24   you heard the word "Pinkerton" was during my jury
25   instructions to you or during the closing argument from the
```

1  lawyer or when?

2        THE WITNESS:  It was in the instructions.

3        THE COURT:  So, it was one --- it was the heading

4  of one of the jury instructions?

5        THE WITNESS:  Yeah.

6        THE COURT:  And the jury instructions were sent

7  back to the jury?

8        THE WITNESS:  Yes.

9        THE COURT:  Those jury instructions were given at

10  the very end of the trial after all the evidence was

11  presented and after all the closing arguments from the

12  lawyers was completed; correct?

13        THE WITNESS:  Correct.

14        THE COURT:  All right.  Proceed.

15              *REDIRECT EXAMINATION*

16  BY MR. LUMUMBA:

17  Q   Miss Wright, let me, first of all, ask you this:  The

18  exhibit which the prosecution has just placed in evidence,

19  that was something that wasn't sent to Mr. Sweeney until

20  October 26th; is that correct?

21  A   Yes, after I read the article.

22  Q   And who called your attention to the article?

23  A   A friend of mine.

24  Q   And did that friend of yours work for the courts?

25  A   No.

1          MR. LUMUMBA:  Okay.  Now, for the record, I would

2  state this -- and the Court can take judicial notice.

3          THE COURT:  Let me stop you right there, because

4  the first filing that I have any knowledge of and as far as

5  I know anybody in this courthouse has any knowledge of is

6  when you filed your motion on October 29th.

7          MR. LUMUMBA:  My motion should have been filed on

8  October 26th, Judge.  That's what it says on the motion.

9          THE COURT:  Well, what it says on the motion that

10  I've got printed out here is October 29th.  You're free to

11  look at it, if you wish.  See up at the top?

12          MR. LUMUMBA:  Yeah, I see.

13          (Pause while Mr. Alkebu-Ian examines the

14  document.)

15          MR. PRESTON:  Judge, I do have a printout from ECF

16  that reflects Document 400 filed 10/26/12.  I don't know if

17  that's part of the confusion or not, but that's -- that's a

18  copy that I printed out.

19          THE COURT:  Sara tells me it was filed on the 26th

20  and that apparently it was stricken for some reason, and

21  then it was -- it was stricken by the clerk, and then it was

22  refiled on the 29th.

23          MR. LUMUMBA:  Okay.

24          THE COURT:  I don't know what the problem was

25  either.  It was refiled under the wrong electronic

1  designation or it wasn't signed or something.

2          MR. LUMUMBA:  I just ask the court to take

3  judicial notice the first time it was filed was on the 26th.

4          THE COURT:  All right.

5  BY MR. LUMUMBA:

6  Q    And it appears that your message to Mr. Sweeney was

7  given on the -- at 11:30 or in that area p.m. on the 26th;

8  is that correct?

9  A    Yes.

10 Q    Prior to that time, you had at no point complained to

11 Mr. Sweeney about a misunderstanding; correct?

12 A    No.

13 Q    And the article which he wrote in the paper was

14 actually written somewhere around October 11th or

15 October 10th; is that correct?

16 A    I don't know that.

17         THE COURT:  Did Mr. Sweeney testify that his first

18 article was October 11th and then he wrote this one several

19 days later?

20         MR. LUMUMBA:  Yes, but his article actually

21 appeared on October the 11th.  I will -- we will look it up,

22 and we will demonstrate that.  It's easy to demonstrate.

23         THE COURT:  He said his conversation with

24 Miss Wright was several days after he first published that

25 first article.

1          MR. LUMUMBA:  Well, his conversation was obviously

2     before the article, and the article was actually printed on

3     the -- no later than the 12th, and we can get that.  We can

4     Google that.  We'll figure that out.

5          In fact, I thought it actually would have appeared

6     on the articles that we filed, but apparently it did; but I

7     think the problem is that it was so light that the date did

8     not come through, but we can easily establish that.

9     BY MR. LUMUMBA:

10    Q    In any event, at no point prior to October 26th did you

11    ever tell Mr. Sweeney that there was any misunderstanding;

12    is that correct?

13    A    No.

14    Q    And at no point at the time that you were talking to

15    Mr. Sweeney on the tape recording that we heard did

16    Mr. Sweeney ever tell you what to say to your -- in terms of

17    your answers?

18    A    No.

19    Q    When he asked you the very clear question as to when

20    you did your research, "Was it during the trial, or was it

21    after the trial?" the response you gave was your own;

22    correct?

23    A    Yes.

24    Q    And in the response you gave, at no point did you say

25    that the research was done prior to -- I mean, after the

1  trial with the exception -- the research that you said you

2  did on the first trial; right?

3  A    Say that again.

4  Q    At no point in your answer to Mr. Sweeney -- you recall

5  the tape we just played?  Do you recall that?

6  A    Yes.

7  Q    Okay.  At no point did you say that any of that

8  research was done after the trial other than the research

9  that you said that you did on the first trial?  Isn't that

10 right?  That's what the tape says; right?

11 A    Yes.

12 Q    And I think that you shared with Mr. Sweeney, during

13 the course of your interview, that you had talked to and

14 knew other attorneys who did litigation and actually had

15 served as somewhat of a consultant before; is that correct?

16 A    I know of -- of a person, but it's not like I did a

17 group of attorneys.

18 Q    All right.  So, you know of an attorney; right?

19 A    Right.

20 Q    And I think you indicated in your interview that you

21 could call that attorney and ask him questions about certain

22 legal concepts; is that correct?

23 A    I don't recall.

24 Q    Well, is that true, that you did -- because we can find

25 it on the tape, if we need to, but is that true?

```
 1  A     I talked to one person, yes.

 2  Q     An attorney?

 3  A     Yes.

 4  Q     And you actually asked him about the Pinkerton Rule?

 5  A     Yes.

 6  Q     In fact, long before you actually started talking about

 7  the Pinkerton Rule, there was controversy about the gun

 8  count in the jury deliberations?

 9          MR. PRESTON:  Objection, relevancy.

10          THE COURT:  Sustained.

11  BY MR. LUMUMBA:

12  Q     Did you ask him about the gun?

13          MR. PRESTON:  Objection, relevancy.

14          THE COURT:  Sustained.

15          You haven't established when that conversation

16  took place.

17  BY MR. LUMUMBA:

18  Q     During the course of the Buju Banton, or Mark Myrie,

19  trial, you knew this attorney; correct?

20  A     Yes.

21  Q     And was he one of the attorneys that you had discussed

22  your previous trial with?

23  A     I don't understand what you mean "previous trial."

24  Q     The malpractice trial, the one that you --

25  A     No.
```

1   Q    And you would ask him questions about the trial; is

2   that correct -- about the Mark Myrie trial?

3   A    No.  The only thing that came up was the *Pinkerton* law.

4   Q    And you asked him about it?

5   A    Yes.

6   Q    When did you ask him about it?

7   A    That was after the trial.

8   Q    Do you have anything in writing, any kind of

9   documentation, that would show when you asked him?

10  A    No, because that was --

11  Q    So, the only documentation that we have that has been

12  created is the document that, in fact -- a tape which, in

13  fact, says that you did research when this was fresh on your

14  mind; is that correct?

15  A    Yes, after the trial.

16  Q    No.  It doesn't say after the trial?

17  A    Yes.

18  Q    Yes what?

19  A    I answered your question yes.

20  Q    It didn't say after the trial, did it?

21  A    No.

22  Q    Okay.  Thank you.

23       And the question that he asked you was not just related

24  to *Pinkerton*?  He asked you -- Mr. Sweeney -- when you did

25  your research?  He didn't say when you did your research on

```
 1   Pinkerton.  That wasn't the only question he asked you.  He
 2   asked you when you did research?  Isn't that what he asked
 3   you?  That you do research, and you said that it was
 4   fascinating?
 5   A    Oh, yes.
 6   Q    He said, "Did you do research during the trial or after
 7   the trial?"  He said "research."  Isn't that what you said?
 8   A    Yes.
 9   Q    And your answer to that was that you did your research
10   when it was fresh on your mind; correct?  Is that what you
11   said?
12   A    Yes, but --
13   Q    And now what you told us -- I'm sorry, do you want to
14   finish?
15   A    That wasn't the case.  I did my research after the
16   trial.
17   Q    So, what you said was not true?
18   A    I answered his questions; and afterwards, that was not
19   the case.  I did all my research after the trial.
20   Q    So -- but in any event, you took some notes down.
21   We've established that; correct?
22   A    Yeah.  I wrote two things on a piece of paper, yeah.
23   Q    That's what you tell us now, but that's not what you
24   told him; right?
25   A    Those were the two things that I wrote down.
```

1  Q    You didn't tell him that you only wrote two things down

2  on paper, did you?

3  A    No.

4  Q    And do you -- and at the time, we can see on the tape

5  that you're looking through some material to find your

6  notes; right?

7  A    Yes.

8  Q    Do you have any notes that you can show us?

9  A    No.

10  Q    Did you have the notes at the time that you read his

11  article?

12  A    No.

13  Q    Do you still have the computer which was used by you to

14  look up various different things?

15  A    Yeah.

16        MR. LUMUMBA:  Okay.  Thank you.

17        THE COURT:  Is there any more questions,

18  Mr. Preston?

19        MR. PRESTON:  Yes, Your Honor.  Thank you.

20                    *RECROSS-EXAMINATION*

21  BY MR. PRESTON:

22  Q    This attorney you talked to, was it an attorney

23  associated with this case in any regard?

24  A    No.

25        MR. PRESTON:  Okay.  That's all I have.

1           Thank you, Judge.

2           THE COURT:  Thank you.  You may step down and have

3   a seat in one of the witness rooms or out in the hallway,

4   please, but don't leave the courthouse yet.

5           Richard, would you call Mr. Steven Boyce --

6   Mr. Boyce.

7           (Witness enters the courtroom.)

8           THE COURT:  Come forward and be sworn, Mr. Boyce.

9           (The witness was duly sworn or affirmed and

10  responded as follows:)

11          THE WITNESS:  I do (seated).

12          THE CLERK:  Please state your name and spell your

13  first and last name for the record.

14          THE WITNESS:  Steven Boyce, S-T-E-V-E-N B-O-Y-C-E.

15                          **STEVEN BOYCE,**

16  the witness, being sworn or affirmed, testified as follows:

17          THE COURT:  Mr. Boyce, do you have any idea why

18  you're here?

19          THE WITNESS:  No.

20          THE COURT:  There's been some information that the

21  court has received that one of the jurors during the Mark

22  Myrie trial may have done some outside research, and we're

23  trying to determine if research was done during the trial

24  and, if so, was it shared with the other jurors and, if so,

25  did it have any impact or what impact did it have on the

1   verdict.

2          So, were you aware that any juror during the trial

3   did any research outside of the case that took place here in

4   the courtroom?

5          THE WITNESS:  I'm unaware of that.

6          THE COURT:  Did any other juror ever discuss with

7   you any outside research or information?

8          THE WITNESS:  No.

9          THE COURT:  During the jury deliberations, did it

10  appear that any juror was talking about information that did

11  not come from inside this courtroom during the trial?

12         THE WITNESS:  No.

13         THE COURT:  All right.

14         Any questions from defense?

15                    *DIRECT EXAMINATION*

16  BY MR. LUMUMBA:

17  Q    Do you recall the juror -- I'm sorry, Mr. Boyce, is it?

18  A    Yes.

19  Q    Good morning.

20  A    Good morning.

21  Q    Do you recall any discussion during the course of the

22  trial or the deliberations from Miss Terri Wright?

23  A    No.

24  Q    You know who that is?

25  A    Apparently another juror.

Q    Yes.  So, you don't recall her?

A    It's been a while, sir.

Q    That's been a couple of years; right?

A    It was last February, I believe.

Q    And were you ever asked the question as to whether or

not you had served on a jury prior to that trial?

A    By whom?

Q    By the judge or during the voir dire.

A    I believe the judge, yes.

Q    And did you understand that question to entail had you

ever served on juries or how many juries you had served on,

if you had ever served before?

A    Right.

Q    And you responded?

A    No.

Q    Well, you responded by saying you had never served

before; is that correct?

A    Right.

Q    Was that an accurate response?

A    Yes.

MR. LUMUMBA:  I have no other questions.

THE COURT:  Mr. Preston, do you have any

questions?

MR. PRESTON:  No, Your Honor.

THE COURT:  Thank you, Mr. Boyce.  You may step

```
 1   down, and you're excused.  Thank you.

 2          Richard, please bring in Janice Benoit.  It's

 3   either Benoit (pronounced "ben wah") or Benoit (pronounced

 4   "be noyt"), B-E-N-O-I-T, Richard.

 5          (The witness enters the courtroom.)

 6          THE COURT:  Please come forward and be sworn,

 7   please.

 8          (The witness was duly sworn or affirmed and

 9   responded as follows:)

10          THE WITNESS:  I do.

11          THE CLERK:  Please be seated.

12          THE WITNESS:  (Seated.)

13          THE CLERK:  Please state your full name and spell

14   your first and last name for the record, please.

15          THE WITNESS:  Janice Benoit, J-A-N-I-C-E

16   B-E-N-O-I-T.

17                         JANICE BENOIT,

18   the witness, being sworn or affirmed, testified as follows:

19          THE COURT:  Miss Benoit, do you have any idea why

20   you're here?

21          THE WITNESS:  No.

22          THE COURT:  Do you remember serving as a juror in

23   the Mark Myrie trial?

24          THE CLERK:  Yes.

25          THE COURT:  The court has received some
```

1 information that one of the jurors may have done some

2 research on some issues in the case outside the courtroom.

3 So, we're trying to determine whether research was done

4 during the trial and, if so, was it discussed with other

5 jurors and, if so, did it impact the verdict.

6          THE WITNESS:  I don't recall that.

7          THE COURT:  Do you remember any juror ever

8 discussing with you or any other juror any information that

9 they had discovered outside the courtroom that was not

10 learned inside this courtroom?

11          THE WITNESS:  I do remember one juror stating that

12 she had done research on, I believe, the *Pinkerton* law.

13          THE COURT:  Okay.

14          THE WITNESS:  And the -- but I have problems

15 hearing, and she was sitting at the far end of the table

16 across and down from where I was sitting, so I couldn't hear

17 what she was stating.

18          THE COURT:  When did that take place?

19          THE WITNESS:  I want to say probably the Monday

20 before we deliberated.

21          THE COURT:  When did you first hear the word

22 *"Pinkerton"*?

23          THE WITNESS:  When you had given us the

24 instructions and we had gone back in there.  That was one of

25 the -- because we have the laws -- the technicalities of the

1  laws, and one of the other things was the *Pinkerton* law.

2           THE COURT:  I sent the written jury instructions

3  back to the jury during your deliberations; right?

4           THE WITNESS:  Yes.

5           THE COURT:  So, that was after I had read those

6  jury instructions to the jury?

7           THE WITNESS:  Right.

8           THE COURT:  That was before your deliberations

9  started?

10          THE WITNESS:  Right.

11          THE COURT:  So, that's the first time you heard of

12 the word "*Pinkerton*," was during your deliberations after I

13 gave you the instructions?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  And you think it was during those

16 deliberations that you heard another juror say they had

17 researched about *Pinkerton*?

18          THE WITNESS:  Yes.

19          THE COURT:  What -- if you can remember and if you

20 heard, what was said about it?

21          THE WITNESS:  I just remember her stating that she

22 had done some research on it; and, you know, her and a few

23 of the other male jurors were discussing that.

24          THE COURT:  Did she say what the research showed

25 or --

```
 1              THE WITNESS:  That I couldn't hear; because when
 2    there's so many people talking in a room, I have a hard time
 3    hearing with that.
 4              THE COURT:  The written jury instruction that you
 5    had explained the *Pinkerton* law; right?
 6              THE WITNESS:  Yes, sir.
 7              THE COURT:  Did she say anything different that
 8    was in that written instruction?
 9              THE WITNESS:  From -- I couldn't hear if she had
10    or not.
11              THE COURT:  Okay.  Did anything she said about
12    what she had found have any impact on your verdict in the
13    case?
14              THE WITNESS:  No, sir.
15              THE COURT:  Did any other juror, to your
16    knowledge, discuss her version as compared to the written
17    version that I sent back with the jury?
18              THE WITNESS:  No, sir.
19              THE COURT:  Any questions from the defense?
20                        *DIRECT EXAMINATION*
21    BY MR. LUMUMBA:
22    Q    Good morning.
23    A    Good morning.
24    Q    Is it Miss Benoit?
25    A    Yes.
```

1  Q    Miss Benoit, okay.

2       Miss Benoit, I think, if I heard you correctly, you

3  told the jury that a juror did say something about the

4  *Pinkerton* law, about doing some research on it; is that

5  correct?

6  A    Yes.

7  Q    And you do remember that clearly?

8  A    Yes.

9  Q    Okay.  And that was while you were sitting at the table

10 in the jury room?

11 A    Yes, sir.

12 Q    So, that would have been probably somewhere in the --

13 in the midst of deliberations; is that right?

14 A    Yes.

15 Q    That was before deliberations were finished, before the

16 verdict had been reached?

17 A    Right.

18 Q    In fact, wouldn't it be safe to say that deliberations

19 began, and then there was a break over a weekend; is that

20 correct?

21 A    Uh-huh.

22 Q    Okay.  And then actually was it safe to say that prior

23 to the break, most of the jurors were voting not guilty;

24 correct?

25            MR. PRESTON:  Objection.

```
 1              THE COURT:  Sustained.

 2              MR. LUMUMBA:  Well, we want to talk about the

 3   impact, Judge, or the possible impact.  It doesn't hurt us

 4   to find out.

 5              THE COURT:  I'm sustaining -- I'm sustaining any

 6   objection that has to do with the thought process of the

 7   jurors except as may relate to any information received from

 8   outside this courtroom.

 9              MR. LUMUMBA:  All right.

10   BY MR. LUMUMBA:

11   Q    But anyway, you know that somewhere before those

12   deliberations were over, the lady said that she found out

13   something about the Pinkerton law or she did research on it?

14   A    Uh-huh.

15   Q    You couldn't hear exactly what she said?

16   A    Correct.

17   Q    Okay.  Because she was talking to two men -- two other

18   men?

19   A    Yes.

20   Q    And they were both on the jury?

21   A    Yes.

22   Q    Okay.  And would it be safe to say that sometime after

23   that conversation jurors began to change their mind as to

24   whether or not they -- how their vote would be?

25   A    No, because we had dissected all the laws, the way we
```

1   felt they applied to his charges.

2   Q    I see.  But Odo you recall that there was a time when

3   the majority of the jurors were for not guilty?

4   A    I'm sorry.  Can you repeat that?

5   Q    Can you recall there was a time when the majority of

6   the jurors were voting not guilty?

7            MR. PRESTON:  Objection.

8            THE COURT:  Sustained.

9            THE WITNESS:  Yes.

10  BY MR. LUMUMBA:

11  Q    Okay.  Well, when -- okay, you -- you went out on

12  deliberations.  What day did you go out on deliberations?

13  Do you remember whether it was the beginning of the weekend

14  or before the weekend or what?

15  A    I believe it was on Friday.

16  Q    Okay.  And then you came back after that weekend; is

17  that correct?

18  A    Yes.

19  Q    Okay.  And the conversation that she gave you about her

20  doing the research occurred on Friday or before Friday?

21  A    No.  On a Monday, I believe.

22  Q    On a Monday.  Okay.  And that was the -- and then it

23  was how long after that before the verdict came back, Oif

24  you recall?

25  A    At least nine hours later.

```
1   Q    Okay.

2        So, you don't know whether what she said affected any

3   other jurors or not?

4   A    No.

5   Q    Okay.  It could have?

6   A    (Shrugs.)  Anything's possible.

7   Q    You don't know to what extent what she researched

8   affected her verdict?

9   A    No, I don't.

10            MR. LUMUMBA:  Okay.  Good.

11            THE COURT:  Any questions, Mr. Preston?

12            MR. LUMUMBA:  One second, Judge.

13            (Pause while Mr. Alkebu-Ian and Mr. Preston

14   confer.)

15   BY MR. LUMUMBA:

16   Q    Did the male jurors that she was talking to respond to

17   her?

18   A    They did.

19   Q    Do you know what they said?

20   A    Not really, no.

21   Q    Okay.  And the "her" that we're talking about, this was

22   a black juror; is that correct?

23   A    No.

24   Q    Oh, this is a white juror that said she had done some

25   research?
```

```
 1   A     Yes.
 2   Q     Okay.  And was there a black female juror in the jury
 3   room?
 4   A     I'm sorry?
 5   Q     Was there a black female juror in the jury room?
 6   A     Yes.
 7   Q     Okay.  How many?  Do you remember?
 8   A     There were three.
 9   Q     There were three.  Okay.  And do you know whether she
10   participated in that discussion?
11   A     No.
12   Q     You don't know?
13   A     No.
14   Q     She could have, but you don't know?
15   A     I don't think 0she had any of those, because I remember
16   the -- there were like two male jurors and the white female
17   debating that.
18              MR. LUMUMBA:  All right.  Thank you.
19              THE COURT:  Thank you.  You may step down.  Miss
20   Benoit, you may step down.  Would you wait out in the
21   hallway, please, until we --
22              MR. LUMUMBA:  One second.
23              THE COURT:  Have a seat just a minute.
24   BY MR. LUMUMBA:
25   Q     Do you know the juror's name who indicated that she had
```

1  done the research?

2  A    I don't recall her name, no.

3  Q    Okay.  Thank you.

4        (The witness exits the courtroom.)

5        THE COURT:  Richard, bring in Frank Arnone,

6  A-R-N-O-N-E, please, or Amone, A-M-O-N-E.

7        (The witness was duly sworn or affirmed and

8  responded as follows:)

9        THE WITNESS:  I do.

10       THE CLERK:  Please be seated.

11       THE WITNESS:  (Seated.)

12       THE CLERK:  Please state your name and spell your

13 first and last name for the record.

14       THE WITNESS:  Frank Arnone, F-R-A-N-K A-R-N-O-N-E.

15                       **FRANK ARNONE,**

16 the witness, being sworn or affirmed, testified as follows:

17       THE COURT:  Mr. Arnone, do you have any idea why

18 you're here?

19       THE WITNESS:  Not exactly, no.

20       THE COURT:  You remember serving as a juror in the

21 Mark Myrie trial?

22       THE WITNESS:  Yes.

23       THE COURT:  Some information has come to the

24 court's attention that perhaps one of the jurors may have

25 done some research outside the courtroom; and, if so, the

1  question then is, was that -- was it done -- if so, was it

2  discussed with the other jurors; and, if so, did it have an

3  impact on the verdict?  Do you recall any juror discussing

4  having done outside research on this case?

5          THE WITNESS:  No, Your Honor.

6          THE COURT:  Did you ever hear a juror discussing

7  with any other juror having done any outside research on

8  this case?

9          THE WITNESS:  No, Your Honor.

10          THE COURT:  During your deliberations at the end

11  of this case, did any juror ever mention outside information

12  during those deliberations?

13          THE WITNESS:  No, Your Honor.

14          THE COURT:  Does the defense have any questions?

15                    *DIRECT EXAMINATION*

16  BY MR. LUMUMBA:

17  Q    Good morning, Mr. Arnone.

18  A    Good morning.

19  Q    Mr. Arnone, during the course of the deliberations, did

20  you discuss what was called the "*Pinkerton* Rule"?

21  A    Excuse me?

22  Q    Did you discuss what was called the "*Pinkerton* Rule"?

23  A    Yes, we did.

24  Q    Okay.  And did any of the jurors indicate at that time

25  that they had done some research on it?

1  A    Not that I remember, no.

2  Q    Okay.

3       Were you asked during the course of deliberations if

4  you had served on a jury before?

5  A    No.

6  Q    Not during deliberations, I'm sorry.  During the voir

7  dire initially, were you asked the question to read your

8  questionnaire and to tell us whether you had served?

9  A    Yes.

10 Q    And you indicated that you had; is that correct?

11 A    Yes.

12 Q    So, if there was a discussion on research on anything,

13 you didn't hear it?  Is that what you're telling us?

14 A    I didn't hear it, no.

15 Q    Good.

16       MR. LUMUMBA:  I don't have any other questions.

17       THE COURT:  Any questions, Mr. Preston?

18       MR. PRESTON:  Yes, sir.

19                  *CROSS-EXAMINATION*

20 BY MR. PRESTON:

21 Q    Mr. Arnone, this doesn't really have to do with what

22 we're talking about here today; but just to put this on the

23 record, my wife and I were shopping and ran into you on an

24 occasion, I think, last summer?  Correct?

25 A    That's correct.

1   Q    And you recognized me from the Myrie case; is that

2   correct?

3   A    Correct.

4   Q    And I told you there was an issue on appeal with the

5   case and I couldn't talk to you about the case; is that

6   correct?

7   A    That's correct.

8        THE COURT:  Thank you, Mr. Arnone.  You may step

9   down, and you're excused.

10       THE WITNESS:  Thank you.

11       THE COURT:  Thank you.

12       (The witness exits the courtroom.)

13       THE COURT:  Do you wish to make arguments?

14       MR. LUMUMBA:  Yes, sir.

15       THE COURT:  You may proceed.  I'll give you five

16  minutes.  Do you think that's sufficient?

17       MR. LUMUMBA:  No, Judge.  No.  I need more time.

18       THE COURT:  How much time would you request?

19       MR. LUMUMBA:  About 15 minutes.

20       THE COURT:  All right, I'll give you 15 minutes.

21       MR. LUMUMBA:  The issues which are before the

22  court are those that have to do -- first of all, I did want

23  to make it clear that we are not waiving our -- all of our

24  motion for new trial -- any portions of it.  In other words,

25  the court has apparently made predetermination on parts of

1   it which have to do with the gun count, but we're not

2   waiving it.  So, to the extent that the court has refused to

3   hear evidence on it, we want that to be noted that we object

4   to it, and we would have presented additional evidence on

5   it.

6        Secondly, as to the portion of the motion which

7   the court is apparently entertaining --

8        THE COURT:  Let me stop you there.  We've heard

9   evidence about the gun count, because *Pinkerton* has to do

10  with only the gun count; right?

11       MR. LUMUMBA:  Well, what you haven't heard and

12  what we're talking about is the fact that the jurors were

13  confused about the instruction, that they felt that any

14  conviction of any of the charges in the case required them

15  to also convict on the gun count; and that later on, they

16  lamented and said that they felt that they should not have

17  found him guilty and that they were happy when you dismissed

18  the count, and they were again saddened when they found out

19  that the five years were added back on -- or could be added

20  back on because the Court of Appeals had reinstated the

21  count.

22       Almost to a juror that it was discussed with, it

23  is reflected in the articles which Mr. Sweeney talked about,

24  it is reflected in Miss Terri Wright's position in the

25  articles and on the tape, which is now part of the evidence;

1  but in addition to that, each of the witnesses that we would

2  have intended to call would have spoke to it.  And if we

3  would have been able to ask the witnesses who appeared on

4  the stand who were selected by the court -- the three jurors

5  who were selected by the court to appear were sure that they

6  would have supported the conclusion, because all of the

7  witnesses that we talked to on the issue indicated that the

8  entire jury had problems with the count or the

9  interpretation of the law and they found it confusing.

10         THE COURT:  Of course, you would agree with me

11  that after a trial is over, the fact that a juror laments

12  the verdict or that a juror claims to have been confused is

13  not grounds for a new trial.

14         MR. LUMUMBA:  Well, of course.  Grounds for a new

15  trial --

16         THE COURT:  You cannot inquire into the thought

17  processes of a juror.

18         MR. LUMUMBA:  Yeah.  What I won't admit and what I

19  do disagree with is the grounds for a new trial if the

20  instruction was confusing and misleading.  And that's what

21  we feel happened here.

22         We obviously are not just making the claim the

23  jurors just felt that way or they lament the verdict that

24  they gave.  That's not -- obviously not a reason for a new

25  trial.

1        THE COURT:  No.  I agree with that.  If you can

2   show that the instruction that the court gave the jury was

3   confusing by the words in the instruction, that's perfectly

4   fine.

5        MR. LUMUMBA:  But what we think we can show is by

6   the jurors themselves that the instruction was confusing,

7   and I think that that should have been entertained by the

8   court.  That's the point that I want to make, in addition to

9   the points that I'm going to make as relates to

10  Miss Wright's testimony.

11        As Miss Wright testified, she did, in fact, do

12  research on this case.  Of course, Miss Wright claims -- and

13  if you listen to the tape -- and the tape is in evidence.

14  The entire tape is in evidence -- she doesn't just say she

15  does the research on *Pinkerton*.  The conversation kind of

16  took off to some degree on *Pinkerton*, and she was looking

17  for some paperwork which would show her research on

18  *Pinkerton*, but the representation made on the tape was

19  that -- and the question put to her had nothing to do with

20  *Pinkerton*.

21        The question put to her:  "I'm fascinated by this

22  research you were doing.  Were you doing it during the

23  course of the trial, or were you doing it at the end of the

24  trial after the trial was over?"

25        All she had to say, if she had not been doing the

research during the course of the trial, is that, "I didn't

do any research during the course of the trial. It all was

done after the trial, and I didn't do any during the course

of the trial." That was the question.

She said clearly that she put the information down

when it was fresh in her mind, went home and researched it.

That's what the tape -- that's her own words out of her own

mouth.

Mr. Sweeney says that's what he was told, and he

does not indicate there was a -- any misunderstanding.

There is no misunderstanding. Sweeney is clear on it. The

tape is clear on it, which is the best evidence; and now

that she can come up and conjure up another explanation once

she gets afraid when an article appeared that said, "Juror

May Be Guilty of Misconduct or May Have Violated the Court's

Rules," and she gets nervous about it and gives him an

e-mail on it, that does not change the reality.

One of the jurors who was called actually helped

explain even on the *Pinkerton* case why that could have

become an issue. It actually could have -- if people are on

the Internet doing research on guns and things of that

nature, then it could have become an issue long before the

court's instruction.

But irrespective of that, she explained that

during the course of the deliberations someone indicated in

1  the jury room that they had done research on the *Pinkerton*

2  case.  That was not solicited.  It was a witness -- or a

3  juror we've never talked to.  It was a juror who, I assume,

4  the court never talked to.  According to Miss Wright, she's

5  the only person the court talked to after the trial,

6  according to her.  I don't know how true that is.

7       And also, counsel opposite says he's never talked

8  to any of the jurors other than the last gentleman who

9  appeared who he bumped into on some occasion.

10       THE COURT:  Let me stop you there.  The court has

11  not talked to Miss Wright.  The court subpoenaed her, and

12  Miss Wright called my judicial assistant about information

13  about showing up and what she was supposed to bring.  The

14  court has never talked to her.

15       MR. LUMUMBA:  The court misunderstands my

16  representation -- or Miss Wright's representation.

17  Miss Wright says on the tape that she talked to the court

18  after the trial.  The other jurors had an opportunity to

19  talk to the court after the trial, but --

20       THE COURT:  Okay.

21       MR. LUMUMBA:  -- she's the only one that took

22  advantage of it.

23       THE COURT:  I want the record to be clear.  She

24  may be referring to the fact that as soon as a trial is

25  over, frequently I will go back and speak to the jurors, not

about the case -- any case, but about the process or about

things that could be improved in the juror experience, that

sort of thing.  That's probably what she's talking about.

MR. LUMUMBA:  Well, by raising that, I'm in no way

trying to impugn the credibility of the court.  I'm just

trying to make it clear that the juror who came in here who

acknowledged that a discussion had taken place on research

on the *Pinkerton* case was the person who apparently the

court (sic), nor us, had talked to.

And it couldn't have just come from anywhere.  I

think that what we have to do is to look at this in the

light in which it is shown clearly on the tape.  There was

no reason to misrepresent the truth at that time.  There was

no -- the -- the opportunity and the motive to conjure up

something which was less than the truth only occurred after

Miss Wright saw an article which indicated that she had

probably violated court orders.

Then she comes back with a total different

construction.  She herself admits that on the tape she never

says that her research was all done after the trial.  The

only thing that she indicates that was done after the trial

on the tape was research on the first trial.

So, that being the case, she clearly violated the

court's instruction.  She had already violated the rules

and the grounds for a mistrial when she misrepresented --

1  misrepresented at the time -- excuse me -- she

2  misrepresented at the time that the -- she was voir-dired

3  that she did not have a -- that -- in her voir dire, she

4  misrepresented the fact that she had really been on a

5  singular case.  She kind of mixes her syntax of the

6  sentence, but it's very clear that if she had seven jury

7  services, she understood that she should be speaking about

8  more than one.  She, at least, should have made it very

9  clear that she had served on more than one case.

10        And what she does is she changes the syntax of her

11  sentence and says she's been on a case where it was a civil

12  case and there was a verdict.  That's the only thing that

13  she says.

14        So, what I'm saying is that she, in two ways,

15  should be subject to being in violation of misconduct orders

16  for this Court:  (a) she didn't -- was not honest during the

17  voir dire, and her dishonesty during the voir dire, or her

18  less than forthrightness, actually created a situation where

19  she sat on a jury where she would have been excluded from.

20        We have an affidavit, which I would offer to the

21  court, from David Markus.  David Markus was not able to be

22  here today because he's tied up in other litigation

23  apparently down in the area of Florida where he resides.

24        But David Markus has submitted to the court an

25  affidavit -- I think it's been filed -- which basically

says, "I was the lead lawyer for Mark Myrie in both of his
trials before this court and appealed before the Eleventh
Circuit. In the second trial, one juror named 'Terri
Wright' testified that she had served in previous juries,
and it was a civil case, and there was a verdict." And he
cites the portion of the transcript where that appears.

"I understand" -- "I understood that to mean that
Miss Wright had only served on one jury and the case was a
civil jury. I have spoken to my co-counsel, Mr. Mark
Seitles and Margaret Moss, and they understand the same
thing that I did.

"Had I known that Miss Wright had served on as
many as seven juries, including criminal cases, there's no
question in my mind that I would have used one of my
peremptory challenges on Miss Wright. Keeping Miss Wright
was a close call in the first place, but this would have
been (sic) easily tipped the balance.

"I have also learned that Miss Wright's conducted
research while on the jury was after the initial vote ten to
two for acquittal; and had I known this in time, I would
have moved to excuse Miss Wright from the jury. In
addition, if she had shared her research with the other
jurors, I would have moved for a mistrial.

"In my opinion, the jury ended up convicting
Mr. Myrtle" -- excuse me, "Mr. Myrie after initially voting

1  ten/two for acquittal because of Miss Wright."

2          I would offer this affidavit to the court as

3  evidence or, as an alternative, as a proffer of what

4  Mr. Markus would offer if he had an opportunity to be

5  called; and we would move for a continuance for him to be

6  called at this point.

7          But, in any event, that was a violation which is

8  worthy of the granting of the motion for a mistrial because

9  it was clearly misconduct on her behalf.

10          The other thing that is clear today, Judge, is the

11  tape is clear.  We didn't make it up.  She acknowledged it

12  was her voice on the tape.  She's very clear about the tape.

13  The Court seemed to be a little confused about how she could

14  have researched this when he only brought it up in

15  instructions.

16          The other juror who was called in here explained

17  that very clearly.  She pointed out that the instructions

18  were given on a Friday.  The long weekend break occurred,

19  and somebody else, she thought -- and, of course, it's been

20  a while; but somebody came in talking about doing research

21  on the case.

22          So, she did the research.  She talked to, at

23  least, two jurors about it who had a conversation back and

24  forth with her.  And so, I think that this is the kind of

25  way -- in order to protect the jury system -- the sanctity

of the jury system and in order to enforce the orders of the court -- there's no less than seven -- and I cite them in my motion. There's no less than seven times in that transcript that the court repeatedly told this juror not to do research.

She acknowledges in her statement that she'd been told not to do research, and why would she even acknowledge that if she was just speaking to research that she had done after the trial? Why would that even be necessary to acknowledge that?

The questioner didn't ask her, "Were you told not to do research during the trial?" He didn't say that. He said, "Did you do research during the trial or after the trial? You know, it's fascinating to me."

And she herself interjects that, "We were told not to do it during the trial, and I don't think what I did hurt too much," is basically what she says.

She says that at the same time she's laughing about it. She says that at the same time she's acknowledging that she put it down when it's fresh in her mind, and she violated the court's rule by taking notes out of here or waiting to create notes so they would not be subject to the court's rules, which says that the notes taken had to be left in the courthouse.

And so, they could be used for the very thing that

1   you tried to guard against, which is to use notes in order

2   to get on the computer and -- and to try to -- to get

3   information which is going to be outside the courtroom in

4   order to assist them in their verdict.

5           So, I think that on, at least, three different

6   counts -- (a) her lack of forthrightness in the jury voir

7   dire; (b) her failure to follow the orders of the court that

8   she clearly knew about as it related to not doing research;

9   and, thirdly, doing the research and discussing it with

10  people in the jury room -- all amounted to reasons why this

11  motion for new trial should be granted.

12          THE COURT:  Mr. Preston, how much time would you

13  like?

14          MR. PRESTON:  Two minutes --

15          THE COURT:  All right.

16          MR. PRESTON:  -- unless the court has questions

17  for me, Your Honor.

18          The court, when we began this hearing, essentially

19  framed the issue that we're dealing with here today; and

20  that issues concerns whether a new trial should be granted,

21  and that would only be required where extrinsic evidence

22  poses a reasonable possibility of prejudice to the

23  defendant.

24          It's the government's position that the

25  evidentiary hearing that was conducted today does not

1 establish that extrinsic evidence was presented to this jury

2 which would give rise to any reasonable possibility that

3 this defendant was prejudiced, and the motion should be

4 denied.

5        THE COURT:  All right.  Thank you.  The court will

6 take it under advisement and will let you know of the

7 ruling.

8        Richard, tell the witnesses they're free to go,

9 please.

10        Thank you very much.

11        MR. LUMUMBA:  Your Honor, can we approach?

12        THE COURT:  All right.

13        *(Bench conference as follows:)*

14        THE COURT:  Do you want this on the record?

15        MR. LUMUMBA:  Not yet.  Not yet.  I'm going to see

16 where we go with it.

17        (Off-the-record bench discussion.)

18        THE COURT:  All right.  Let's go on the record.

19        MR. ALKEBU-IAN:  Judge, there's another matter.

20        THE COURT:  I'm not going to be double-teamed.

21        MR. ALKEBU-IAN:  This is separate, something that

22 happened to me downstairs that I will report later.

23        My name -- I'm Imhotep Alkebu-Ian, and this is my

24 first time in your court.

25        I came through the check downstairs, and the

1  bailiffs or marshals are saying that they told me to put my

2  cellphone in the locker.  If they said that, I was busy down

3  there and I didn't do it.

4        When I came up to court the first time, I had my

5  cellphone with me.  It was turned off.  When I went back

6  downstairs to get the computer, he asked me, "Do you have

7  your cellphone?"

8        I answered, "Yes.  Yes, I do."

9        And he was quite mad and upset and a little loud

10 and said he was going to come back up here and tell the

11 judge and, "We'll see about that" and told me to make

12 certain I put my phone in the locker, and I did at this

13 time.

14        So, it was inadvertent, not intentional.  I just,

15 you know, missed it, had it on me; and I just wanted to let

16 the court know you'll probably hear about it, I guess.

17 It's -- it's a big deal to them.  It was inadvertent on my

18 part.  I just wanted to let the court know my side of it.

19        THE COURT:  I probably won't hear about it; but if

20 I do, I have heard your side.

21        MR. LUMUMBA:  You want me to just it put on the

22 record here?

23        THE COURT:  I'll do it.

24        For the record, defense counsel has asked that the

25 court allow a continuance to have Miss Wright's computer

1   subpoenaed and have forensic experts examine her computer to

2   see if additional evidence can be obtained, and I've denied

3   that.

4        Secondly, they've proffered the testimony of

5   Mr. Sweeney, the reporter, that if they were to recall him

6   as a witness, he would say that he talked to Miss Wright a

7   few days after the first conversation that led to the

8   article and that she had no problem with what she had told

9   him.  It was only until October 26th when he got the text

10  message that she indicated any problem with his prior

11  conversation with her, and the government has stipulated

12  that that proffer can be accepted as evidence rather than

13  recalling Mr. Sweeney.

14       Anything else?

15       MR. LUMUMBA:  That's it.

16       THE COURT:  All right.  Thank you.

17       MR. PRESTON:  Thank you.

18       *(Bench conference concluded.)*

19       THE COURT:  All right.  We're adjourned.

20       (Adjourned at 11:50 a.m.)

21                    - - - - -

22

23

24

25

CERTIFICATE OF REPORTER

I, SHERRILL L. JACKSON, Federal Official Court Reporter for the United States District Court, Middle District of Florida, Tampa Division,

DO HEREBY CERTIFY, that I was authorized to and did, through use of Computer-Aided Transcription, report in shorthand the proceedings and evidence in this cause, as stated in the caption on page 1 of this transcript, and that the pages numbered 1 to 94, inclusive, constitute a true and correct transcription of my shorthand report of said proceedings and evidence.

IN WITNESS WHEREOF I have hereunto set my hand this 13th day of February, 2013.

*s/Sherrill L. Jackson*

_____
SHERRILL L. JACKSON, RPR, FPR
Federal Official Court Reporter